UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                 :

   -against -                                   :        07 CR 265 (ENV)

STEVEN COREN,                                   :

         Defendant.                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X




## MEMORANDUM ON BEHALF OF DEFENDANT STEVEN COREN
## IN ANTICIPATION OF SENTENCING

Vivian Shevitz
150 Greenway Terrace - 52W
Forest Hills, New York 11375
914 - 763 - 2122
FAX: 888- 859-0158
vivian@shevitzlaw.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT: SENTENCING CONSIDERATIONS 1

CONGRESS INTENDED A PROBATIONARY SENTENCE . . . . . . . 10

THE GUIDELINE CALCULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . 16

DISCUSSION OF GUIDELINE CALCULATIONS . . . . . . . . . . . . . . 24

    A. The Loss And Restitution Amounts . . . . . . . . . . . . . . . . . . . . 25

        1. Losses Are Overstated, Unreliable, And Unproven . . . 25

        2. Rosemar's Employees' Losses Are Not Chargeable
           Against Steven Coren . . . . . . . . . . . . . . . . . . . . . . . . 41

        3. An Alternative Basis For Loss Calculation . . . . . . . . . 48

    B. Number of Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    C. Role (+4 Points) and Abuse of Trust (+2) . . . . . . . . . . . . . . . 52

    D. The Obstruction Enhancement . . . . . . . . . . . . . . . . . . . . . . . 59

"3553 FACTORS": THE DEFENDANT AND THE OFFENSE . . . . . 62

    No Similarly Situated Defendants . . . . . . . . . . . . . . . . . . . . . . . 65

    Types of Sentences Available . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    The Nature of The Offense And Offender . . . . . . . . . . . . . . . . . 70

RESTITUTION SHOULD NOT BE JOINT AND SEVERAL . . . . . . . 89

THERE SHOULD BE A STAY PENDING APPEAL . . . . . . . . . . . . . . 90

OTHER SENTENCING REQUESTS . . . . . . . . . . . . . . . . . . . . . . . . 91

MISTAKES AND UPDATED INFORMATION IN THE
 PRESENTENCE REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

<u>PRELIMINARY STATEMENT</u>: <u>SENTENCING CONSIDERATIONS</u>

This memorandum is respectfully submitted by Steven Coren in anticipation of sentencing. Despite the government's push to heap punishment upon punishment, preferring humiliation over fairness, we ask for a sentence of probation in this case where the victim, New York State itself, would punish this conduct as a misdemeanor. It would be a waste, and inconsistent with the principles of sentencing, to incarcerate Steven Coren, much less for the huge amount of time urged by the government and arguably called for in the Guidelines. The taxpayers would not benefit, and instead would pay twice: once to pay for expensive and non-beneficial incarceration, and again for the loss of productivity. Steven Coren is more than a man who stepped over the line with regard to prevailing wage advice to clients. He is – and was – a good and decent man who has much to offer. The only conceivable purpose of sentencing to be served would be general deterrence, but deterrence of this type of misconduct by an attorney has already been achieved in the very prosecution of this heretofore-unprosecuted

offense, by the humiliation, anxiety, and instability that comes with the intrusive government hammer over the defendant's life, the loss of the defendant's license and livelihood, the ignominy and personal consequence of this conviction.

Probation is not a sentence of "leniency" but rather is an authorized sentence in its own right. Though the Sentencing Commission ignored the directive, it is the sentence that Congress, in passing the Sentencing Reform Act that established the Guidelines and the Commission that was to write them, embraced as the appropriate sentence for a first-time non-violent offender (28 U.S.C. § 994 (j) ("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury"). Probation is the sentence, together with non-incarceratory alternative penalties, such as community service, that should be

imposed here.

While many defendants present letters attesting to the "good side" of their past lives, Steven Coren's goodness has garnered some 48 letters from family, friends, and colleagues, who chose to write to Your Honor, hoping to persuade the Court of Steve's honesty, integrity, compassion, and humanity – to assure the Court that this episode of Steve Coren's life is aberrational and unlike Steve's everyday morality and ethics, to entreat the Court to exercise justice and give this first time offender the "'second chance" that is the first-line punishment in the statute, the Sentencing Reform Act. To a person, these common-sense community members implore the Court that no one would benefit by incarcerating Steve Coren. In the words of his colleague and friend, Stephen Cooper, incarceration "would be a waste of taxpayer's money and a waste of a precious resource, Steven's mind."

It would also be a loss for those who have relied or been inspired by this generous person upon whom others have relied throughout his life – witness the many letter-writers who describe Steve's unselfish responses to their needs and traumas. Deterrence has been

accomplished, both "specific" deterrence, and "general deterrence", in this broadcast to the world that crossing this line will result in stripping the wrongdoer of his livelihood, his license, his identity, and of hundreds of thousands of dollars in lost earnings as well as moneys that must be spent on legal fees.

Against any suggested "need" for incarceration that the government will urge, the Court should – must – consider Steve Coren as a person, in the context of the crime of which he was convicted, a misdemeanor in the State of New York.  Steve is the devoted son to his elderly mother Lucille, who lives in an assisted care community, whom he visits and cares for regularly.  He is father to two outstanding young adults, who with his and his wife's guidance and generosity have become remarkable and productive members of society, who continue to learn from Steve, even in his present situation.  Steve's son Andrew is now engaged to be married in June of next year, and if Steve were to miss this occasion it would devastate the entire family.

The Court should also consider the words of Steve's sister, Carol Markman, seven years older than Steve, who – in words echoed by

numerous friends and colleagues whose paths have crossed with Steve's -- describes her brother as a "kind, gentle, and caring person", who has always "made room" for others and given of himself to enrich others' lives and teach them when he could. (Carol Markman reports that both her children "worked in Steven's law practice for one summer and they each learned that they did not want to become attorneys". He has helped others' children by employing them in his practice, by taking them under his wing, by consoling them when things go round, by drinking tea at a child's tea party with a young girl who lives next to Steve and showing her that adults care).

The Court should consider Ms. Markman's observation, as well, that might explain Steve's departure from his otherwise-moral course of conduct. As Carol explains, Steven "took the death of our father in April 2001 very hard." He was vitally involved in caring for his father during the father's decline into dementia – which occurred during the period he was dealing with cooperators Whitley and Torres (All-American/ Serrot), perhaps explaining the distraction from his moral course and leading to his "experimentation" with the wage laws. Carol

Markman "believe[s] that the strange path that led to Steven's problem with law has its origin in the period leading up to our father's death".

Of course, it is impossible to pinpoint with certainty the factors that "led to Steven's problem". But it is possible to glean from the letters of friends and family that Steve's lack of judgment and loss of moral compass in advising his clients on this prevailing wage issue was not a characteristic that will repeat itself. In his otherwise blameless life, he stepped over the line in giving advice to two clients who misused "the system" for their own gain. Again, for this conduct, New York State, the "victim", itself imposed misdemeanor liability.

It would be unjustified to impose a sentence beyond the State sentence. This is so especially in that the "victim"-agencies, whose late-produced "victim" letters, show no financial loss whatsoever. Rather, they moralistically espouse the wrongs of failing to pay prevailing wage workers the full benefits the law requires that they receive, but do not identify any specific way in which they suffered.

Because Mr. Coren has suffered the ignominy of conviction and sentence, because he does not pose a risk of future danger, and because

deterrence and retribution are satisfied by the consequences the world now sees from his shattered life, probation is "sufficient" here. 18 U.S.C. § 3553(a) (court must choose sentence "not greater than necessary").

Steve Coren is not a villain. He is a "decent" person who acted aberrantly in pressing the law beyond its outer limit. And even in this one endeavor, which mars his life forever now, he was not motivated by venality or even greed, profiting only with modest legal fees for services and a relatively modest administrative fee, similar to that given to Trustees of union benefit funds.

Mr. Coren's clients who were the profiteers, who "gamed" the system, and then were recruited to testify against their lawyer – All-American/Serrot (Whitley and Torres), and Takbeer (Beig and Hussain) – did gain. But in evaluating Mr. Coren's participation in the wrongs revealed here, it is important to note, as does the 3500 material turned over in this case, that those contractors had their own agendae. They did not limit their misconduct to prevailing wage violations. Takbeer's Beig enforced kickbacks to him from his workers, unknown to Steven

Coren. Whitley and Torres, from All-American and Serrot, also had their agenda of milking the fund to take benefits where they could – certainly shown the way by Mr. Coren's advice, but not "directed" by Mr. Coren or any greed on his part. Mr. Coren's part in the misconduct was that through his advice, he provided advice about how the CBT could work, giving one client a vehicle to pull money for themselves out of CBT benefit funds and giving another a way to stretch use of the CBT funds. But equally important is that Mr. Coren and CBT had a client list of CBT participants who did not succumb to greed.

While "the schemes" here may have resulted in financial harm to the workers in that they should have received more in benefits (if indeed the prevailing practice was to give such "full" benefits), Mr. Coren's advice could have been "played" honestly, as did the multitude of his clients for whom he set up CBT accounts. (A current Summary Statement from CBT's administrator shows 24 active clients, and a large number of terminated/ inactive accounts. Serrot maintains a balance as of 9/30/09 of $4,008 in the acccount; Takbeer's balance is $3,172. The balance for all businesses with CBT accounts is

$650,000.00-plus.).

For these reasons, and those that follow; for conduct that has already led Steve Coren to ruin; for conduct that is a first-time offense -- counsel respectfully suggests that a jail term is not "needed" here, would be punishment greater than necessary, and is not statutorily supported.  18 U.S.C. § 3553(a).

Authorized Sentences & Purposes of Sentencing:  3553

Before discussing the Guideline calculations, we address the authorized sentences and the purposes of sentencing, with the hope of persuading this Court that, not only should the Guideline sentence be rejected on 3553(a) grounds, but it should be rejected as a matter of policy (as the Supreme Court has explained is an option of the district court where the Guideline sentence, as a matter of policy, produces a sentence that is untenable).   See Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558, 570 (2007) (upholding rejection of crack Guideline as a matter of policy disagreement when the Guideline yields a sentence greater than necessary).

Here, the Guideline sentence is unbelievably harsh.  The

enhancements that "could" be applied are even harsher, and plainly overstate the "wrong", which we know, if for no other reason than that the victim criminalized the misconduct as a misdemeanor (and has not pursued prosecutions in any event). To what end are these Guideline sentences "necessary"? Why should they be applied here, when they are inconsistent with Congress's directive to treat first-time offenders by way of probation? Why should society – and this Court of justice -- enforce such drastic retribution, where no one would benefit by locking Mr. Coren up, where it would be a total waste of precious resources, where paying to incarcerate Steven Coren would not protect anyone nor, indeed, send any greater message of deterrence than has been sent already by the "mere" prosecution, and the consequences of such a prosecution? The community would not be safer. He is not a candidate for recidivism. A probationary sentence, with community service requirements, would be sufficient to meet the goals of criminal prosecution and objectives of punishment. To the extent that the Guidelines do not even provide the possibility of a probationary sentence in this context, they should be rejected.

<u>Congress Intended a Probationary Sentence</u>:

I cannot say it better and so quote extensively from the amicus brief in support of the en banc consideration, submitted by the National Association of Criminal Defense Lawyers (NACDL) in <u>United States v. Tomko</u>, 562 F.3d 558 (3d Cir. 2009 (en banc):

"Congress viewed probation as a distinct type of criminal punishment with independent value in the overall sentencing scheme, rather than as a gift of 'leniency' to be bestowed only in extraordinary cases where imprisonment is for some reason considered too harsh. Through the Sentencing Reform Act ("SRA"), Congress directed the Sentencing Commission to implement that view by treating probation as a distinct type of sentence and by designing guidelines that would, inter alia, insure that probationary sentences would be the `general(ly) appropriate' sentence in certain defined categories of cases.  28 U.S.C. § 994(j).

"The Commission, however, totally failed to comply with these congressional mandates.  Instead, and as a result of its misinterpretation of the SRA and its legislative history, the

Commission designed a guidelines structure that overwhelmingly favored the imposition of prison sentences and provided no mechanism for guiding sentencing courts to probationary sentences. This failure to provide a meaningful mechanism for probation occurred even in cases involving first-time offenders and non-violent offenses, and even when supervision with conditions likely would produce sufficient punishment and deterrence, while also enhancing restitution and rehabilitation.

"The most obvious example of this defect in the Guidelines structure as it relates to Mr. [Coren] occurs in the Sentencing Table, which, most egregiously, does not even have a category for `probation,' but rather refers to this entirely different option as `zero months of imprisonment.' Compounding this basic error, the Sentencing Table (1) provides no guideline range where probation is the only recommended sanction, (2) permits straight probation for a first offender only at levels 1-8, (3) permits probation with confinement conditions, such as home detention, only up to level 10, (4) requires at least half of the minimum of the guideline range to be served in prison at levels 11 and 12, and (5) allows for incarceration only, at levels 13-43 months.

"The Guidelines' incorrect treatment of probation also flows from a fundamental flaw in the Commission's use of empirical data in its original analysis of past sentencing practices: in estimating average sentences under past practice, the Commission only examined sentences that resulted in imprisonment, thus disregarding roughly 48% of all sentences given during the relevant time period. This approach might have been entirely appropriate if the Commission had generated a different `Guideline' for recommending probation, based on that part of past practice, as the statute required, but it never did. As a result of the exclusion of probation sentences from its `empirical research,' the Commission's base line sentencing data was incorrect and – when then used for all sentencings – artificially skewed to harsher sentences. The omission of probationary sentences from the data used to generate the Sentencing Table meant that the Commission's starting point included only consideration of the most severe offenses, i.e., the half of all cases that merited incarceration under the old system. The effect of this flaw is most significant in white collar cases .... Because of the fundamental defect in the empirical

research, the Guidelines incorrectly emphasize imprisonment, and probation has been used far less frequently than anticipated by Congress. As courts used probation less frequently over time, the precedent explaining its function declined.

"Because the [fraud] guideline rests on a flawed analysis of `empirical data and national experience,' it `does not exemplify the Commission's exercise of its characteristic institutional role.' Accordingly, it is not an abuse of discretion for a district court to conclude that the tax guideline inappropriately yields a sentence that is greater than necessary, even in a `mine-run case.' <u>Kimbrough</u>, 128 S. Ct. 558, 575 (2007); <u>Gall v. United States</u>, 128 S. Ct. 586, 594 n.2 (2007).

"In the wake of <u>United States v. Booker</u>, 543 U.S. 220 (2005), <u>Gall</u>, and <u>Kimbrough</u>, sentencing courts must be encouraged to take a new look at the Guidelines' treatment of probation as a sentencing option and independently determine in individual cases whether, despite any negative treatment, probation is nonetheless the statutorily mandated – that is, "minimally sufficient," see <u>United States v.</u>

Serafini, 233 F.3d 758, 776 (3d Cir. 2000) – sentence in each individual case. This approach to probation is consistent with the mandate of the SRA, recent pronouncements by the Supreme Court, and social and public policy recognizing the benefits of punishing individuals through alternatives to incarceration."

* * * *

The Second Circuit Court of Appeals has itself recently agreed that policy disagreements – and a failure of the Commission to act in its prescribed role – are a valid ground to reject the Guideline sentence. United States v. Jones, 531 F.3d 163, 170-171 (2d Cir. 2008) (footnotes omitted) ("The Supreme Court has clearly signaled that district courts enjoy considerable discretion in identifying the grounds that can justify a non-Guidelines sentence. .. In Kimbrough, it specifically rejected an argument that had found some favor in appellate courts, including our own, ... that a district court could not rely on a policy disagreement with the Sentencing Commission to explain a non-Guidelines sentence. See Kimbrough v. United States, 128 S. Ct. at 570 (citing government's acknowledgment that `courts may vary [from Guidelines ranges] based

solely on policy considerations, including disagreements with the Guidelines' (alteration in original)); cf. Rita v. United States, 127 S. Ct. at 2465 (observing that district court may consider arguments that `Guidelines sentence itself fails properly to reflect § 3553(a) considerations')."

With this introduction, we turn to the PSR and the Guideline calculations, and will urge the Court to reject the harsh Guideline as an appropriate sentence in this case. We then turn to the mandatory factors under 18 U.S.C. § 3553(a).

THE GUIDELINE CALCULATIONS

Because a federal district court must still "consider" the Guidelines as one factor, I discuss the PSR's Guideline calculations.

Counts one through twelve, the mail and wire fraud convictions, start with level 7. (That level proposes a sentence of 0-6 months for a Category I defendant – which would, I submit, be "sufficient"). The original PSR added 14 points for "amount of loss" as a "specific offense characteristic". This figure is premised on a loss of more than $400,000. Specifically, the government charged a loss of $750,000-plus,

reflecting prevailing wage worker benefits that did not get paid to the prevailing wage workers identified with the Indictment counts. With a 14-point addition for "loss", the sentencing range is 37-46 months (level 21).

By Addendum to the PSR the government claims that the defendant is also responsible for losses of workers employed by Rosemar Construction. It puts the amount at $1,141,028.31, which would "bump up" the "offense characteristic" enhancement by 2, adding 16 points to the base level of 7. Level 23 proposes a range of 46-57 months.

As I argue below, certainly the additional amount for Rosemar should not be attributed to Mr. Coren under any standard, especially not in a criminal sentencing context. In charging Mr. Coren with Rosemar's wrongdoing, the government tells Probation that it did not charge the owner of Rosemar, "due to a lack of evidence regarding his/her criminal intent." However, the government still claims that Mr. Coren is responsible for whatever Rosemar may have done that may have resulted in its workers not getting paid – asserting that it can

hold Mr. Coren responsible because of his "creation of a CBT account" for Rosemar Construction. We address this below.

The government then adds another 4 points because "the instant offense involved over 50 victims."

It adds 4 more on the ground that defendant was supposedly "an organizer of a criminal activity that involved five or more participants."

Two more points are added by reason of the charge that the defendant "violated his professional and ethical obligations, and abused a position of public trust granted by his legal license."

Finally it (para. 71) adds two points for obstruction of a grand jury investigation.

The total for the fraud counts prior to the PSR addendum was level 33 – 135 - 168 months proposed jail time.

_____

As to count 13 through 15, the money laundering offenses, the guideline provisions are the same, except that two additional points are added under U.S.S.G. 2S1.1(b)(2)(B), the Guideline applicable to money laundering offenses, which states that the level for a defendant

convicted under 18 U.S.C. 1956 is increased by two levels (just because it is a section 1956 offense).    According to the original PSR, the total offense level was 35 under the money laundering convictions.  Level 35 proposes jail time of 168-210 months.

Now in the Addendum, the level is raised again solely by reason of the increased amount of "loss" by reason of Rosemar's apparently unintended prevailing wage losses.  Instead of increasing the base offense offense level for money laundering by 14, as the original PSR did, it increases by 16.  The total proposed level is now claimed to be level 37.  This level carries a proposed incarceration of 210-262 months.

_____

For Count 16, Obstruction of Justice, the government charges a level 29.  The Guideline, 2J1.2(c)(1), applicable to obstruction offenses under 18 U.S.C. 1512, directs use of Guideline 2X3.1 "if the offense involved obstructing the investigation or prosecution of a criminal offense".  Guideline 2X3.1 provides a base offense level 6 levels lower than the offense level for the "underlying offense".  The PSR puts the "underlying offense level" here as level 35, and thus ascribes level 29 (6

levels lower) as the obstruction offense level.

_____

Downward Adjustment

The original PSR gave Mr. Coren a 2-point reduction for his guilty plea. By the Addendum, it advises that Mr. Coren should not receive that reduction because of the motions to dismiss based on the legal issues we raised. (The Addendum states that Mr. Coren made two separate motions to withdraw his plea. Unnumbered Addendum, p.3, "Acceptance of Responsibility". The Report is, of course, wrong: Mr. Coren made one motion after his plea, when present counsel reviewed mail fraud law and brought a motion to dismiss and withdraw the plea because those mail fraud concepts had never been addressed by prior counsel with Mr. Coren).

The government claims that Mr. Coren's conduct in challenging the legal bases of the charges shows he did not "accept responsibility". This -- notwithstanding this Court's recognition in the decision denying the motion to dismiss based on the failure of the "harm to property" element of the mail and wire fraud statute, that Mr. Coren "does not ...

allege that he is factually innocent of the charged acts, and has fully admitted to morally culpable conduct and conduct he acknowledges was criminal under other, uncharged provisions of law." (Decision and Order of August 20, 2009, p.10 n.9).

The original PSR thus reached the conclusion that the guideline imprisonment range for a level 33, Criminal History Category I, is 135 to 168 months. By the Addendum, the guideline imprisonment range is 210-262 months. Either of these ranges is stunning, given that the offense was a misdemeanor at the time in New York State at the time of its commission. Either of these ranges imposes cruel and unnecessarily harsh punishment, seemingly for brash retribution, unrelated to any reasonable purpose of sentencing of criminal offenses.

_____

Additional provisions of punishment as noted in the PSR are as follows:

Supervised release is not required by statute, but the advisory Guidelines provide for a period of 2-3 years of supervised release

(U.S.S.G. 5D1.1(a) and 5 D1.2(a)(2).

Notably, the PSR states that probation is authorized for all convictions (PSR para. 144). The authorized term of probation is not less than 1 year nor more than 5 years on each count. 18 U.S.C. 3561(a), (c)(1). The Report goes on to state that the Guidelines operate to disallow a probationary sentence because the "minimum term in the guideline range is greater than 6 months". (Para. 145). (The objection, of course, is that no Guideline range starts with the presumption of probation, in direct contravention of 28 U.S.C. 994(j)'s directive).

In terms of restitution, the government claimed at first that $750,507,192.72 is the amount, but now claims that Rosemar's conduct should be criminal attributed to Mr. Coren (though there was insufficient evidence of criminal intent of its owner). Its figure is now $1,141,028.31. Restitution is a mandatory sentence provision. But it need not be joint and several (18 U.S.C. § 3664(h) "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect

the level of contribution to the victim's loss and economic circumstances of each defendant."). The government advised prior counsel that the contractors have paid or will pay all the restitution due the workers.

Large fines are authorized. The Guideline provision set the fine range from $17,500 to $1,501,038.26 (5E1.2(c)(3)) prior to the addendum, and $20,000 to $3,783,761.28 after the Addendum, raised solely by virtue of the alleged loss amount "caused" by Rosemar's conduct and its apparent failure to pay prevailing wages. Because of Mr. Coren's family's negative cash flow, however, the PSR advises that Mr. Coren appears unable to pay a fine.

_____

<u>Mitigating Factor</u>:

The Probation Department itself recognizes a mitigating factor, noting that the defendant will lose his professional license, which will limit his prospects for future employment. That factor warrants, in Probation's view as mine, a mitigating factor that would apply even were the Guidelines mandatory.

That factor is, again, the elephant in the room, so to speak –

though the PSR does acknowledge it.  But in truth, it is big.  Mr. Coren has already lost his practice, and his means of earning of a living.  He will have to undergo disciplinary proceedings, costing him even more time, resources, humiliation.  He has always been productive – and as the many, many letters from clients, friends, co-counsel and family show – has always helped people through his legal skills (as in other ways too).  He is, to be honest, flailing, trying to find something productive to do.  This loss of livelihood militates against additional punishment here.

We now turn to a discussion of the propriety of the Guideline calculations:

## DISCUSSION OF GUIDELINE CALCULATIONS

Although we believe that a non-Guideline sentence is appropriate – and share Judge Easterbrook's view that Guideline calculations should not be mandated when a non-Guideline sentence is immediately obviously appropriate (New York Law Journal, September 14, 2009 ("Judge Frank Easterbrook urged the U.S. Sentencing Commission on Wednesday to loosen the federal sentencing guidelines so that judges

waste less time in precisely determining ranges that may not matter anyway") (http://www.law.com/newswire/cache/1202433750691.html) – I proceed to discuss the "offense characteristics" and enhancements.

A.  <u>The Loss And Restitution Amounts</u>

1.  <u>Losses Are Overstated, Unreliable, And Unproven</u>

Defendant Steven Coren acknowledges that, pursuant to some foreseeable misuses by his piggish clients of the CBT, his clients gained, and prevailing wage workers did not receive the full value of fringe benefits that the law may require.  However, there is no evidence that Mr. Coren agreed to, or  "foresaw" just how piggish his clients would be, nor shared their desire to "screw" their workers (to use witness Whitley's colorful description of his motivation). In fact, Mr. Coren urged his clients to the contrary. Mr. Coren, therefore, should not be charged with the "full" loss to every worker who did not receive benefits to the extent to satisfy what the government terms a "reasonable relationship" with the amount of credits claimed by contractors on certified payrolls or CBT deposit records – payrolls neither seen, nor reviewed by Mr. Coren – to have been paid into the

CBT on their behalf.

"Loss" calculations are to be measured on the basis of the pecuniary harm to "victims" from "the offense", or gain to a defendant. See U.S.S.G. § 2B1.1(b)(1), providing that a defendant's offense level can be increased based on the amount of loss caused by his offense, which is the pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense; 2B1.1, cmt., application n. 3(A)(i) and (iv). Courts are told that, in determining the amount of loss attributable to any defendant, it must consider acts and omissions committed, aided, abetted, counseled, or willfully caused by the defendant. U.S. Sentencing Guidelines Manual § 1B1.3(a)(1)(A).

In some cases, victims' "losses", while real, do not result from a the defendant's activities, but rather the unforeseen acts of others, going beyond what the defendant "had in mind". In a case founded on conspiracy – or a "scheme", as was charged here -- when assessing "the loss amount attributable to a particular defendant convicted of a conspiracy offense," the district court must first determine "the scope of

the criminal activity the defendant agreed to jointly undertake." <u>United States v. McCrimmon</u>, 362 F.3d 725, 731 (11th Cir. 2004).

I respectfully suggest Mr. Coren's conduct must be separated from that of his greedy clients who did obtain money that they should not have received, and did mistreat workers – but well beyond what Mr. Coren "taught" them was possible.

First, Takbeer, whose principals, cooperators Beig and Hussain did not testify: From the 3500 material turned over, we see that Takbeer's "agenda" was far different from Mr. Coren's, and their misconduct unforeseeable to him. (Beig and Hussain are awaiting sentence and hence, Your Honor should have more information than we do). Beig, and his uncharged father, Tariq, were involved in a million-dollar kickback scheme, whereby the insisted on, and obtained, cash kickbacks paid to them by their prevailing wage workers.

Their workers lost, it is true. But it is impossible to "sever out" what they intended (they admit that Mr. Coren had no knowledge of the kickback scheme, resulting in -- according to Beig's guilty plea before this Court -- a loss of over a million dollars to Beig's workers.

Consequently, Mr. Coren is not responsible for the full measure of losses to Takbeer's workers, if any.

In addition to Beig's was running a kickback scheme and his lies about how much he paid his workers, he lied about which workers were on site, listing himself and office workers on certified payrolls as being on site when they were not, and more. Although Beig and Hussein claimed to the federal prosecutors that Mr. Coren was the one "responsible" for their use of CBT to withhold proper fringe benefits, Beig told them that "Coren has no knowledge of BEIG's kickback scheme and that Coren did not advise him to destroy such records".

Mr. Coren is not and should not be held responsible for the wealth of losses Beig caused his workers. To the extent the government calculates the prevailing wage losses on the basis of documents submitted by Beig, his certified payrolls were false in many ways other than the fact that he checked the box indicating that he did or would pay prevailing wages.

That is also because Takbeer paid benefits through the union contributions, overlapping workers in some instances. Mr. Coren does

not dispute the fact that he did advise Beig that he could use CBT moneys to pay other benefit funds. But he believed (as the 3500 material shows) that this would be a temporary measure. According to Beig's description to the interviewing agents, Mr. Coren appeared shocked after reviewing the Takbeer search warrant attachment, when he first learned the extent to which Beig had continued using CBT funds to pay union obligations (Interview of Mohammad Azam Beig, dated 2/3/06, DOL Case 20-703C-0052-LC-J.) He believed that Beig would be using CBT funds only to get through some hard times and difficulties with cash flow. At all times he told his client (who was taping him) that he (the client) would have to properly contribute the CBT and put the money back in the CBT.

In any event, the government's loss figures do not account for the benefits that certain Takbeer workers did get through union-fund-benefits. We offer the following chart (revised since the time we provided a chart to the Probation Office), derived from government exhibits of remittances made by CBT on behalf of Takbeer to NLRA §302 (c)(5) union benefit funds (e.g. Mason Tenders, Excavators Local

731 benefit funds)  as well as other benefit providers (e.g Blue Cross/Shield) documents.  Our figures show that the government's loss figures are at least overstated by $166,000-plus. Since we do not know what source documents the government used (because the prosecutors have declined to provide to me back-up/source documents for the government's loss calculations, though I asked repeatedly by email communications starting in  September 12, 2009 - September 24, 2009), at least a hearing is required, and the government should be required to provide documents and explain the figures upon which it relied. Since the government has not satisfied its burden, we have been forced to assume, in some way, a burden of proof that should not be ours. But for now, we can say that the records show that medical and other benefits did go to workers (and their union benefit fund accounts), some of the very workers named by the government in its loss calculations as having received no benefits, through the alternative union benefit funds:

| Last | First | Trade | Medical Benefits Actually Provided Per Gov't | Medical benefits Actually Provided & Union Fund Contrib | Total Benefits Not Paid to Worker | Change to Gov't Loss Amount |
|------|-------|-------|------|------|------|------|
| Akmal | Zeb | Laborer | 0.00 | $26,432.74 | 0.00 | - 1,755.60 |
| Akram | Muham. | Multi | 0.00 | $20,358.49 | 3,909.93 | -20,358.49 |
| Butt | Habib | Laborer | 0.00 | 10,198.87 | 26,567.84 | -10,198.87 |
| **Butt | Abid | Laborer | 0.00 | 61,245.17 | 0.00 | -26,567.84*** |
| Cantu | Jorge | Laborer | 0.00 | 3,351.71 | 4,630.36 | -3,351.71 |
| Chatha | Muham. | Laborer | 0.00 | 41,257.98 | 0.00 | -2,303.00 |
| Parikh | Hasm. | Superv. | 0.00 | N/A | | -1,220.50 |
| Singh | Jasw. | Paint | 0.00 | 3,350.27 | 38,748.54 | -3,350.27 |

SUB TOTAL                                                                                        - 69,106.28

TOTAL ( Loss deductions because of benefits provided to
         & Union fund for contributing workers above                   -166,195.25

Notes:

* Chart Revised

**Abid Butt was not listed by this name in the government's loss schedule however, the government lists a worker named Habib Butt. It is not clear if the two names refer to the same person.

*** Assuming Habib Butt and Abid Butt are the same person, this amount reflects the balance of the credit due against the government's loss schedule for benefits actually provided to Habib Butt
Source: Information derived from government exhibits of remittances made by CBT on behalf of
         Takbeer to NLRA §302 (c)(5) union benefit funds (e.g. Mason Tenders, Excavators Local
         731 benefit funds)  as well as other benefit providers (e.g Blue Cross/Shield).

We are not attaching source documents to this submission,

because the Court should not have to decide these matters on the basis of documents thrown at it at the last minute. The Court should know that counsel has repeatedly asked the government (Ms. Coyne and Mr. Fodeman, by email) for all source documents for the loss calculations. Ms. Coyne, understandably busy with her new baby, wrote back (e.g., an email to me of September 12, 2009) that prior counsel has the underlying documents, and that they used certified payrolls and contributions to CBT) (email from Sarah Coyne to Vivian Shevitz).

The clients' certified payrolls and contribution forms cannot be accepted on their face as reliable statements to calculate losses caused by Mr. Coren. Beig's (Takbeer) 3500 material shows that they filed falsified reports in the first place – not limited to certifying that prevailing wage laws were complied with, but adding (or subtracting) names, and perhaps amounts of hours. We do not know the extent of this, obviously, without some extensive analysis.

What is clear it that the government should not and cannot reliably use those sources to "prove" the losses attributable to Mr. Coren's "part" in the conduct. We need the source documents.

The same is true for All American / Serrot, who, unbeknownst to Mr. Coren, lied on certified payrolls beyond merely checking the box certifying that they had paid prevailing wage benefits. They paid bribes, underpaid workers (as the "victim statements" show), and were not "reliable" in reporting who worked, how many hours, and what, they did, on their certified payrolls and CBT contributions.

Moreover, Mr. Coren's "part" in the "scheme" did not extend to the losses that his clients caused the workers. The (aborted) trial evidence and the "3500" material show that, as to Whitley and Torres' "scheme", while Mr. Coren knew that Whitley and Torres planned to obtain money for themselves (health and vacation benefits) through the CBT funds, he at all times advised them to pay medical benefits to the workers, not to not pay them. (See, e.g., Trial Tr. 170: "Yes", there would be coverage purchased for the workers for whom the contributions had really been paid; Tr. 180: "Yes, they would receive some medical benefits", though that would not "use up the entire contribution").

Consequently, the government's use of documents (though we

don't know which source documents) that apparently show that Whitley and Torres did not in fact pay any or some benefits to some workers overstates losses caused by Mr. Coren's part in "the scheme".

Mr. Coren foresaw gains to his clients, not losses to the workers. According to the trial testimony, Mr. Coren foresaw misuse of the CBT in three ways, and only three ways: as the government asked Whitley (Tr.181), "you mentioned that there were three different ways that [Mr. Coren] discussed with you in March of 2000 that you could do this" – meaning, to use the government's characterization, "loot and still say on your certified payrolls you would pay the workers the benefits". Whitley identified buying health insurance for non-prevailing wage workers, including the owners, setting up a vacation trust for which mostly Whitley and Torres qualified, and buying life insurance with a cash value. (Tr.181-186).

Consequently Mr. Coren neither intended anything but gains to his clients, nor agreed to the extent of their schemes to deprive the workers of benefits. He should not be liable for the full losses identified by the government.

In asking the government for back-up, I also asked Ms. Coyne for a specific file. In 3500-KH-34, an email string, Takbeer's Khalid referred to a specific file he was giving the government. This was in answer to Mr. Della Penna's question: "How much of money deposited in CBT was spent on benefits for those Takbeer employees who actually earned the money for both SCA and MTA". (Email exchanges in September 2009, between Vivian Shevitz and Sarah Coyne/ Morris Fodeman). Though I asked for the referred-to-"attached file," we have not received it.

In one request, I also mentioned that we wanted to see how the government treated "waiting periods" and also administrative fees for fund administrators. Ms. Coyne answered that the very point of this case was that waiting periods were not relevant because they were not permitted. She also stated that the Department of Labor says that an employer cannot get credit for administrative fees (email of September 13, 2009).

We agree that to the extent that a worker did not receive benefits through CBT during waiting periods, cash payments may be called for.

Whether administrative fees are properly taken as credits is not clear.

But waiting periods are not irrelevant, nor that this case stands for the principle that they are illegal.

This Court, in denying the motion to dismiss on interpretation of ERISA/ prevailing wage law grounds, never said that waiting periods are not relevant. At the very least, if workers got cash benefits when they left the employ of an employer-contractor whose company had a policy of a waiting period, the workers would have to pay taxes and other withholding on those benefits. Those amounts are deductible from amounts workers "lost" even if losses are to be calculated by amounts workers did not receive, as opposed to what Mr. Coren's clients "diverted" (to use the Court's words, Decision and Order of August 29, 2008, p. 23 ("indictment ... alleges that Coren devised the CBT with the specific intent to help contractors shirk their prevailing wage obligations and divert money that should have been spent on benefits for prevailing wage workers back into their own pockets").

The other reason why waiting periods are relevant, however, is that they elucidate what actually "prevails" "on the ground", so to

speak – a consideration that ought to be relevant for loss purposes.

Though the government dismissed it as irrelevant, union benefit plans

regularly set waiting periods for workers to receive medical and other

benefits. There are many, many examples, though collective bargaining

agreements, and payments in "reality" as opposed to theory, are hard to

come by.   Since the Secretary of Labor is required to use "prevailing"

wages to determine the "prevailing wage rate" in a given area,

presumably union practice, not just its words, should determine what

"prevails".

Though it is indeed hard to come by actual figures, an article at

http://www.heartland.org/publications/budget%20tax/article/23895,

entitled "Davis-Bacon Union Wage Costs are Reaching Far Beyond

Government", published on October 8, 2008, discusses that most

prevailing wage rates "are determined by voluntary participation

surveys."   In non-union construction, the article reads, "workers in the

same craft often receive different wages based on factors such as the

person's skill level and seniority".

The article goes on to state that Fringe Benefits are thus

"overstated. ... [V]irtually all union fringe benefits go to union funds, which then use the money to provide the benefits. In non-union construction, benefits [other than government jobs] are paid directly to the employees. The difference between the two approaches can result in misleading calculations of union fringe benefits".

"For example, the article goes on, "one benefit workers receive is a payment to a union retirement trust, but if the employee doesn't remain a union member for the required period of time, or doesn't work enough hours in a given period to vest in the fund, the employee receives nothing." Continuing, "Unions also calculate as fringe benefits funds that provide little or no benefit to the employee." The article, a copy of which is attached as Exhibit "A" (along with a copy of a portion of a union benefit brochure), mentions by way of example training funds, but there are others.

The bottom line is that in prevailing practice, workers do not receive "full fringe benefits". While theoretically, under the Labor Law, they "should" receive them, in prevailing practice workers do not obtain all benefits.

That has caused many people, including Senator Gregg, to object to government mandates for local contractors.   E.g., "The Truth About Project Labor Agreements",

http://www.thetruthaboutplas.com/2009/09/18/first-federal-project-labor-agreement-under-obama-administration-Riles-Senator-Gregg", attached hereto as Exhibit "B".

This is also a topic as to which, notwithstanding this Court's decision denying the motion to dismiss, the last word has not been written   The very issue – of ERISA and local wage laws – is being considered for acceptance on a petition for certiorari by the United States Supreme Court.  A petition was thus filed in <u>Golden Gate Restaurant Assoc. v. San Francisco, California,</u> Supreme Court Docket No.08-1515, raising similar issues about whether localities can legislate benefits required to be paid.  Specifically, the "Question Presented" in the petition is: "Whether ERISA section 514(a), 29 U.S.C. § 1144(a), preempts local laws mandating ongoing employer contributions for employee health-benefits, or alternative payments to a local government, and extensive recordkeeping and reporting and disclosure

requirements, a question on which the courts of appeals are in conflict."

On October 5, 2009, the Supreme Court issued an Order "inviting" the Solicitor General to "file briefs in these cases expressing the views of the United States." Commentators believe that this is a case the Court will soon consider on the merits (especially since it just accepted another case concerning whether a state court lawsuit over a federal employee's health care benefits is preempted by federal law, see Health Care Service Corp. v. Pollitt, 09-38 (certiorari granted, October 13, 2009) (see http://origin.www.supremecourtus.gov/docket/09-38.htm). [1]

---

[1]According to the Supreme Court docket sheet in 09-38, Health Care Service Corp. v. Pollitt, the Questions Presented as to the Decision Below (558 F.3d 615) are:

"1. Whether the Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. §§ 8901-14, completely preempts -- and therefore makes removable to federal court – a state court suit challenging enrollment and health benefits determinations that are subject to the exclusively federal remedial scheme established in FEHBA.

2. Whether the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which authorizes federal removal jurisdiction over state court suits brought against persons "acting under" a federal officer when sued for actions "under color of [federal] ... office," encompasses a suit against a government contractor administering a FEHBA plan, where the contractor is sued for actions taken pursuant to the government contract."

There is a serious question here, and we suggest that the Supreme Court's word will go a long way to determining how, and if, "losses" are properly considered. (The Supreme Court's word will, if it finds in favor of local employee benefit laws, serve as the true "general deterrent" in this area.)

The government's calculations are too facile. There are many questions that need to be answered before Steve Coren should be charged with the entire "loss" caused by the Beig/ Hussain and the Whitley/ Torres teams.

　　　2.　Rosemar's Employees' Losses Are Not Chargable Against Steven Coren.

The government, as noted, through the Probation Office's late-provided "addendum", tries to tack on yet additional losses as to Mr. Coren's former client-Rosemar's employees. This attempt to increase the loss amount should be rejected out of hand.

A defendant may be responsible for criminal "relevant conduct", but not non-criminal conduct, especially where (as here) the Court recognizes that the defendant was but an aider and abettor of the

principals' (contractors') criminal conduct.  If nothing else, the fact that the government states that it has insufficient evidence that Rosemar's principal committed criminal conduct, shows that its attempt to "pin" Rosemar employees' losses on Mr. Coren is not justified.   Whatever Rosemar's principal may have done, it is not criminal conduct, the loss figures of which are attributable to Mr. Coren.  Accord, <u>United States v. Shafer</u>, 199 F.3d 826, 830-31 (6th Cir. 1999) (Davis-Bacon violation prosecuted under 18 U.S.C. § 1001; Court rules that non-criminal conduct is not "relevant conduct", stating: "There is a difference, however, between conduct that does not lead to a criminal conviction for technical reasons, such as criminal activity that was not included in an indictment or criminal conduct for which the statute of limitations has expired, and conduct that could never lead to a criminal conviction because the conduct is not of a criminal nature. Indeed, we believe the Sentencing Guidelines simply do not provide for the consideration of conduct under § 1B1.3(a)(2) unless that conduct involves an offense that could lead  to a criminal conviction resulting in prison time.) (Interestingly, <u>Shafer</u> was a prosecution under 18 U.S.C. § 1001 – the

applicable provision that the government did not use in this case. Indeed, the sentencing Guidelines presupposes that Davis Bacon violations are not prosecuted, as here, under mail fraud law, but rather under § 1001. See U.S.S.G. § 2B1.1(F) ("Special Rules": "In a case involving a Davis Bacon Act violation (...criminally prosecuted under 18 U.S.C. § 1001), the value of the benefits shall be considered to be not less than the difference between the legally required wages and actual wages paid"). We leave for another day and another Court the (in)applicability of the mail fraud statute to this type of violation).

Thus, notwithstanding the fact that the restitution statute, 18 U.S.C. 3664, requires the government to provide alleged restitution figures and names no later than 60 days before the original sentencing date ("(d) (1) Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution."), the government – after the fact – tries to unfairly "up the ante" by adding over a million dollars

for alleged losses (and restitution) to the workers of contractor Rosemar Construction. By Addendum to the Presentence Report, Probation adopts the governments' view of this additional loss amount.

Rosemar was not part of any "the scheme" for which Mr. Coren is or should be liable. The Addendum thus reports that the government "has not criminal charged the owner of Rosemar Construction , due to a lack of evidence regarding his/her criminal intent." (Addendum, third page (pages are unnumbered), "Loss Calculation"). There is thus no "principal" of this offense – and hence, no criminal offense. Mr. Coren is obviously not "the principal". He could not have acted with intent to violate even prevailing wage laws without knowledge that this particular client was violating the law.

To our knowledge Rosemar (like the huge majority of Mr. Coren's other CBT clients) has never been charged even with violating prevailing wage laws. In the absence of some intent to misuse the system, about which Mr. Coren "knew" and "intended", Mr. Coren cannot be responsible for Rosemar's employees' losses.

Present counsel asked AUSA Coyne by email (immediately upon

receiving the Addendum) why the government believes that Mr. Coren is responsible criminally for "losses" of Rosemar's employees. Ms. Coyne responded that "Coren is responsible for the loss regarding the Rosemar CBT account because it was set up for the exact same purpose as the Serrot and Takbeer accounts – to help contractors wrongfully evade compliance with the prevailing wage obligation." Further, Ms. Coyne states, "Certain contractors have an `advice of counsel' defense in that they relied on Coren telling him that the operation of the trust was lawful" .... Ms. Coyne asserts that Mr. Coren knew "it" was "not" "as evidenced by the evidence at trial and his guilty plea allocution." (Email of September 18, 2009 from Sarah Coyne to Vivian Shevitz).

The government is wrong that the mere setting up of a CBT account yields criminal liability for losses – especially when the owner of the construction company himself did not intend to misuse the CBT account, as is the case with Rosemar, according to the government's decision to not charge Rosemar. Indeed, in this Court's decision and order of August 29, 2008 denying the motion to dismiss on grounds that the prevailing wage law was not violated because of the interplay with

ERISA, this Court stated: "The indictment does not ... suggest that the structure of the CBT is illegal, or that, standing alone, the use of a trust, like the CBT, to pay benefits to nonprevailing wage workers violates prevailing wage laws." (p.12). "Rather," the Court continued, "the indictment charges that, on the advice, counsel and with the assistance of Coren, Coren's client-contractors defrauded government agencies by falsely claiming credit for paying their public workers ...." (Id. p.13). "Had Coren's contractor- clients used the CBT in the manner alleged as a pooled trust, i.e., accepting only contributions from prevailing wage workers while providing benefits to nonprevailing wage workers and prevailing wage workers alike, but adjusted the amount of prevailing wage credit accordingly, there would be no fraud, and consequently, no crime." The Court stated that the crime occurred only upon a contractor's misuse of the CBT– "effectively using money to pay other expenses".

Here, the government's own position is that the "principal" contractor of Rosemar did not have criminal intent to deprive workers of prevailing wage benefits. It is wrong to say that the mere creation of

a CBT account sometime in the past for Rosemar was a criminal act. There is no "principal", and thus Mr. Coren cannot be liable as an aider and abettor of Rosemar's non-criminal conduct.

In this Court's ruling of August 29, 2008, the Court recognized that there must be a "principal" committing criminal wrongdoing for Mr. Coren to be criminally liable. The Court stated (at p.23): "The indictment ... does not claim he did it alone. It charges Coren as an aider and abettor of his clients' alleged prevailing wage law crimes." The Court wrote further that, in order to prove Mr. Coren's participation with his client's underlying crime, it must prove that the contractor committed the underlying crime and that Mr. Coren acted with the "`specific purpose' [quotes in original] of bringing about that crime."

The principal of Rosemar is not deemed to have committed a crime by these federal prosecutors. It is difficult to see how there could have been a prevailing wage loss of Rosemar's employees if its principal did not intend to deprive his workers of prevailing wages (unless the State deems prevailing wage offenses a "strict liability" crime). But in

any event, Mr. Coren is not responsible for those losses.

Further, factually, Mr. Coren's contact with Rosemar was limited.
He did not know if Rosemar was working on public jobs or private jobs.
He did not know Rosemar's principal's plans to any degree. Rather, to
the extent that Mr. Coren had any contact with Rosemar's principal, he
indicated to Mr. Coren not that he intended to deprive prevailing wage
workers of benefits and "take" those benefits for himself – but rather
that he intended to satisfy prevailing wage laws by giving workers full
benefits. Mr. Coren, indeed, prepared for Rosemar (during his very
limited representation of Rosemar's principal) a form giving Rosemar's
employees an option, which they were asked to consider and sign,
whether to participate in the ERISA trust, or whether to decline
participation in the benefit program and receive taxable benefit
compensation. (A copy of that form and Rosemar's policy given to
workers is appended as Exhibit "C").

The government's effort to heap additional loss responsibility on
Steven Coren for something Rosemar's principal did without criminal
intent is beyond the pale. Rosemar's losses, however they may have

occurred, should not be charged to Steve Coren.

### 3. An Alternative Basis For Loss Calculation

Losses chargeable to Steve Coren should be limited to the amounts "diverted" by his clients All American/ Serrot, and Takbeer. He did not know if his clients would, as others did, pay their workers who did not qualify for benefits when they left the client's employ. That happened "outside" his "scheme".

Moreover, as shown by Exhibit "D", a Summary of the CBT account as of September 30, 2009, Takbeer and Serrot both have balances in the CBT fund (as do others). At least the losses would have to be reduced by $4,008.00, plus $3,172.31, which are the amounts still in the CBT fund for, respectively, Serrot and Takbeer.

The Court can also see that there were many other clients in the CBT. We have no knowledge that any of these other contractors misused the CBT. This fact shows even more strongly that it would be wrong to adopt the government's view that just because he created a CBT account for a client, he committed some wrong.

The loss amount is also overstated as to workers who did not

"qualify" for benefits by reason of waiting periods.  If the workers who did not qualify for health insurance received lump sum payments when they left the firms, those benefits would be reduced by taxes they would have had to pay.  The figures are far more complicated than the government admits.

In truth, the only reliable Guideline is the base level for "the fraud", level 7.  The 14 (or 16)-level additional for the "amount of loss" is not fairly attributed to Mr. Coren (though it may be applicable to the cooperator/defendants themselves) and is premised on unreliable and untestable source material.    (Nor, for these reasons, should Mr. Coren, therefore, be responsible for restitution of all those amounts.)  A court can order restitution on a joint and several basis, or as an individual matter.  18 U.S.C. § 3664(h).  Mr. Coren should be responsible for at most the gains he received, or the amounts obtained by his clients for themselves as a result of pulling money for themselves out of the CBT.  Takbeer and Serrot, apparently have or will and should pay the workers what they owe them.

Pursuant to 18 U.S.C. §3664(e), "[t]he burden of demonstrating

the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." Only losses that are "a result of the offense" are included. The loss amount as to Takbeer should be reduced because it is impossible to attributed losses to Mr. Coren's part of the conduct, as opposed to Takbeer's separate criminal schemes.

(At least as to restitution, the Court should not require Mr. Coren to pay jointly and severally with Beig (who we are told has yet to be sentenced but will, of course, have a restitution obligation). Rather, as is allowed by statute, 18 U.S.C. §3664(h), the Court should "apportion liability" and not require Mr. Coren to pay the full amount of losses for which Beig is responsible, to reflect the lesser "level of contribution to the victim[s'] loss[es]" on the part of Mr. Coren. Mr. Coren's restitution obligation should be a fraction of the Takbeer and Serrot losses and should be imposed as an individual obligation, payable once his sentence is served.)

The base offense level should be 7. If there is any enhancement for amount of loss, we should have an opportunity to challenge the

government's source documents.  It should be told to specify, and provide, exactly how it calculated "losses".

B. <u>NUMBER OF VICTIMS</u>:

The PSR states that there are 85 victims as to the "instant offense".  This would result in an enhancement of 4 points for "more than 50 victims).  The government, however – and the PSR – allege that there are only four victims (the agencies) of the mail fraud, not 85. Though restitution may theoretically be ordered as to the workers of Takbeer and Serrot (though we believe that Takbeer's and Serrot's principals should shoulder the burden of that restitution), the number of workers are not the identified "victims" of the "instant offense". There are 4 victims for purposes of calculating the number of victims of the "instant offense".[2] The Court should not enhance the base level for

---

[2] Interestingly, the Probation Department provided  "Victim Impact" statements along with the Addendum to the Presentence Report.  Those statements are made by the MTA and Metro North, The New York City Housing Authority, and the SCA."  Apparently these statements, dated July and August 2009, were written to Your Honor to persuade the Court to not allow Mr. Coren to withdraw his plea.  The Housing Authority states that it suffered "severe and substantial economic loss", but does not identify what that loss is, except that it released contract funds to the contractors.  The other two agencies do not state that they suffered economic losses.  The MTA states that Mr.

85 victims.

## C.  ROLE (+4 POINTS) AND ABUSE OF TRUST (+2)

The government would add six more points on the basis that Mr. Coren was allegedly the organizer and deviser of the fraudulent schemes, and "counseled the other participants (his clients) regarding how to utilize them."  Pursuant to U.S.S.G. 3B1.1(a) (leader/organizer) four points are added, and under 3B1.3 ("abuse" of a position of trust by use of his law license), two points.

In other words, six extra points – years of jail time – are added solely on the basis of the fact that Mr. Coren was an attorney who advised his clients about a way they could misuse the trust.

We object to the "role enhancement".  Mr. Coren was not a

---

Coren's conduct, aside from "involving prevailing wage laws", also "implicates greater concerns attendant to the overall integrity of the public contracting process."  The SCA is more ardent, stating: "The failure to pay prevailing wages not only violates NYS law and the contractual obligations of the contractor, it also victimizes the worker s who do not get their full wages and benefits."

We point this out because we continue to believe that there was no economic loss to these agency-victims, and no intent to deprive them of economic value (hence, no mail fraud).  These named "victims" do not identify any such losses because – we think – there are none.

leader/organizer of the criminal activity of his clients. He was a lawyer providing advice. This Court stated in his Decision denying the first motion to dismiss that Mr. Coren was the aider and abettor of his principal-clients' misconduct. That cannot translate to a leadership role, and should not.

Mr. Coren's sole role was as a lawyer, which is already embraced in the enhancement of "abuse of trust". An additional leadership role, of any degree, is duplicative, unjustified and should be omitted. See USSG §3B1.3 ("Abuse of Position of Trust or Use of Special Skill"), which states: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under §3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under §3B1.1

54

(Aggravating Role).” (Emphasis added).

It is tempting for the government to urge “leadership” points when an attorney is the defendant.  But participation with clients in wrongdoing does not and should not automatically subject the defendant to a bump-up of 4 points as a leader and manager.  Some times – as here – the defendant was acting just as an attorney.

The point is well made in United States v. Frega, 179 F.3d 793 (9th Cir. 1999).  There, the attorney-defendant Frega was charged under RICO with paying numerous bribes to Superior Court judges in the San Diego area, along with his clients, in order to obtain an unfair advantage in cases in which he was involved.  The predicate offenses under the RICO charge were mail fraud – deprivation of honest services – and bribery.

Upon the defendant’s appeal, the government cross- appealed the sentence – contending that attorney Frega should have received a 4-level enhancement under U.S.S.G. § 3B1.1(a) as an organizer or leader of a criminal activity that involved 5 or more participants or was otherwise extensive.  The Court of Appeals upheld the district court’s

rejection of that enhancement.

The Court rejected the enhancement even though Frega's participation was far "worse", and more extensive, than Mr. Coren's in this case. According to the Court of Appeals' opinion, 179 F.3d at 811, Frega "was the scheme's central actor, having bankrolled it, profited from it, involved other participants, and exercised control over conspirators."

However, the Court of Appeals noted in rejecting the government's appeal, Frega "was in no position to coerce any of the judges into rendering favorable decisions", and "often played the role of errand boy". Further, Frega "did not necessarily have a `claimed right' to a larger share of the pie". As the district court had held, all defendants were "in it together." No one was "supervising or directing the activities of the others". Id., 179 F.3d at 811.

Mr. Coren's role was even less than Frega's. He advised about the availability of legal "maneuvers", but he did not direct or supervise anyone in "playing out" the offense. He was not a supervisor or leader.

Moreover, the "leadership" enhancement requires the criminal

participation of five people in a criminal offense.  Here, there were two separate "schemes" charged.  In neither were there five participants.  The contractor-owners were the only ones "involved."

Application Note 4 explaining the "leadership" enhancement lists factors a court should consider in determining whether a role enhancement should apply.  Those factors include "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."   Application of those factors leads to the conclusion that a leadership enhancement of any amount is unwarranted.

Mr. Coren's participation amounted more to "suggest[ing] committing the offense" than exercising control over the participants.  Application Note 4 states specifically that "[t]his adjustment does not apply to a defendant who merely suggests committing the offense".

U.S.S.G. 3B1.1 (Application Note 4).  The four-point enhancement under 3B1.1(a) should not be applied.

Further comments in the "background" section of this Guideline enhancement section also counsel against application of the enhancement.  The Commission stated its purpose in enacting this enhancement on the basis that it is "likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and /or are more likely to recidivate".  Enhancing Mr. Coren's sentence as a "leader" or "manager" – when he did not profit except by obtaining clients and charging a fee – would not serve the purposes of the enhancement.  No leadership enhancement should be imposed.  See also United States v. Teyer, 322 F. Supp.2d 359, 374 (S.D.N.Y. 2004 (Lynch, J.) (declining to apply leadership enhancement for defendant who "enjoy[ed] some degree of authority" but in context that authority did not translate to a "managerial or supervisory role in nature, such that [the defendant] bears substantially more culpability than the average participant.  Common sense and the objectives of punishment

must be considered in determining the proper application of role enhancements under the Guidelines"). Accord, <u>United States. v. Burgos</u>, 324 F.3d 88 (2d Cir. 2003) (nature of transaction – a co-defendant bringing checks to defendant as middleman in a bank fraud case – "itself does not bespeak control"; "control" over others is a condition of a supervisory enhancement. No enhancement warranted.)

The "abuse of trust" and "role enhancement" additions are also cumulative. Both arise from the nature of Mr. Coren's role as legal adviser. Even were the leadership enhancement be appropriate on the basis that the defendant was "the lawyer", a deduction (departure) would be warranted under <u>United States v. Lauersen</u>, 348 F.3d 329, 344 (2d Cir. 2003), which held that when a Guideline calculation reaches a high sentencing range because of the "cumulation of ... substantially overlapping enhancements", that is a circumstance "not adequately considered" by the Guidelines. Excision of the 4-point "leadership" enhancement" would be appropriate even in a mandatory Guideline situation.

### D. <u>THE OBSTRUCTION ENHANCEMENT</u>:

We turn to the obstruction enhancement, which seems a bit of overkill since one of the convictions is for obstruction. We suggest that, to the extent that the "obstruction" came about as a result of a maneuver directed by the government to which Beig was put up – that is, trying to ensnare the defendant into agreeing that he should get rid of a USB drive – an enhancement should be rejected on policy grounds if nothing else.

Steve Coren may have advocated a way "around" the prevailing wage laws, but he was not dishonest or obstructive. He did nothing to conceal or obfuscate until Mr. Beig, trying to minimize his own "losses", was told to get him to "obstruct" by getting him to agree that Beig should "get rid" of the computer drive.

While Mr. Coren pled guilty, because he did try to help his client make a decision concerning the computer drive, he also knew that originals and copies of documents pertaining to prevailing wage credits were maintained elsewhere. His conduct is not the type of "willful"

obstruction of justice that should yield an obstruction enhancement.

Application Note 3 to the obstruction Guideline, § 3C1.1, notes that obstructive conduct "can vary widely in nature, degree of planning, and seriousness. If nothing else is clear, Mr. Coren did not "plan" to obstruct. The possibility of getting rid of a USB drive was put to him while he was otherwise advising his client.

We respectfully suggest that the conduct is more akin to that in Application note 5, which sets forth conduct that may technically violate obstruction laws, but is not the type of "willful" obstruction to which the enhancement should apply. Moreover, it was impossible for Mr. Coren to actually obstruct justice in this case, since Beig was a government cooperator at the time he gave Mr. Coren the "opportunity" to tell him to "obstruct".

In these circumstances, the Court should not add an obstruction enhancement.

In any event, factors under 18 U.S.C. § 3553(a) surely trump the cumulation of enhancements that the government has conjured up in this case.

E.  <u>ACCEPTANCE OF RESPONSIBILITY</u>

By the PSR Addendum, the government not only adds unwarranted losses, for a company whose principal did not criminally violate the law, but would strip Mr. Coren of his acceptance of responsibility points.  The "acceptance" points are properly awarded.

Mr. Coren has leveled legal challenges to the government's unique charges in this case.  As this Court noted in denying the motion to dismiss on mail fraud-non-property-loss grounds, Mr. Coren has not denied his factual responsibility.  He pled guilty, understanding that, if his conduct be classified as a "crime", he is guilty.

He accepts full responsibility for what happened.  The points should not be denied.  Accord, e.g., <u>United States v. Acosta</u>, 534 F.3d 574, 581 (7th Cir. 2008) ("`a defendant should not be denied a reduction for acceptance of responsibility when he only challenges the legal conclusion that should be drawn from facts that he has admitted'").

<u>SECTION 3553 FACTORS: THE DEFENDANT, AND THE OFFENSE</u>

18 U.S.C. § 3553(a) is mandatory in application.  It provides:

(a) Factors To Be Considered in Imposing a Sentence.— The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(.c) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most
effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing
range established for—

    (A) the applicable category of offense
    committed by the applicable category
    of defendant as set forth in the
    guidelines—

        (I) issued by the
        Sentencing Commission
        pursuant to section 994
        (a)(1) of title 28, ,,,

    (B) in the case of a violation of
    probation or supervised release,
    [remainder omitted]

(5) any pertinent policy statement—

    (A) issued by the Sentencing
    Commission pursuant to section 994
    (a)(2) of title 28, United States Code,
    ...

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense

We have already considered the Guidelines. Any policy statements, of course, are only as "good" as the Guidelines". And we showed that the Guidelines do not reflect the policy that the Commission was told to follow.

We turn to the non-Guideline § 3553(a) factors, in essence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, adequately deter criminal conduct, protect the public, and provide correctional treatment; (3) the kinds of sentences available, and (4) the kinds of sentences given to similarly situated defendants.

<u>No Similarly Situated Defendants</u>:

We start with the last factor first:  There are no "similarly situated" defendants that we know of.  This is the first prosecution of its kind (other than Handakas, which of course resulted in acquittal and then dismissal of the indictment).  To the extent there are "similarly situated defendants" they would be State prevailing wage violators, whose sentences would have been misdemeanor sentences (and most probably ACD's for the first violation).

The government has known about prevailing wage violations and violators for years, but did not pursue known prevailing wage violators.  The conduct of Whitley and Torres goes back to 2000 and 2001, and the Department of Labor obviously knew it.  Not only were they not prosecuted at that time, but they were apparently allowed to continue "looting" their employees.

The government went "after" Steve Coren because he was a savory "target".  But he acted as an attorney who misadvised his clients, not, as were some of his clients and seemingly "similar" defendants, acting out of greed.

So, then, who are "similar" defendants?  Steve Coren is not a mega-million-dollar defrauder, like many corporate defendants in the news of late.  He is a lawyer who is a good person who made a mistake. In this regard, a recent entry in the Law Journal, September 30, 2009, notes that Southern District Judge Victor A. Marrero imposed a non-prison sentence on a former Paul Hastings tax associate who traded on insider information, instead ordering nine months in a halfway house, on weekends if the defendant chose.  The defendant Holzer was reportedly "among several people charged ... in connection with a $4.8 million scheme to profit from information" that a former Lehman brothers employee "gleaned" from his wife, a partner in a public relations firm.  Judge Marrero reportedly "agreed with the probation department's assessment that this was a `good person who made a terrible mistake'".  September 20, 2009, Law.com.   (The defendant also reportedly was taped agreeing that he had a "back story" in case he was questioned by authorities).  Id.

Consideration of "similarly situated defendants" justifies a probationary sentence.

We also note the disparity in treatment by the government between Mr. Coren, and the cooperators, whose greed resulted in far more harm than anything done or urged by Steven Coren. In particular, we note the government's almost apologetic stance at the plea colloquy of cooperator BEIG, who, unknown to Mr. Coren and plainly neither foreseen nor justified by him, forced his workers to kick back money to him to the tune of over a million dollars. During Beig's plea colloquy, the government told the Court that its agreement with Beig, whom the government sent in to ensnare Steve Coren in "obstructive" efforts at a time Mr. Coren was conducting a client conference, proposed a range of 57-71 months. The prosecutor stressed that this range was "at the high end" (See Beig, Plea Colloquy, p. 27). However, the government acknowledged that Beig's conduct resulted in "workers pa[ying] back or kick[ing] back to Takbeer over a million dollars of what was certified as paid to workers as certified payrolls"). (Indeed, this circumstance belies the accuracy and reliability of the government's loss figures – as will be discussed below; simply put here, as Ms. Coyne responded to my email query, the government's summary

chart was prepared on the basis of "certified payrolls" which are "wrong" not only by virtue of credits wrongly taken because of prevailing wage violations, but because of the contractor-cooperators' falsification of those payrolls for their own, independent purposes).

Beig's 3500 material makes clear that Mr. Coren had no knowledge of this activity, and plainly, indeed, believed there were no kickbacks. He would have dealt with Beig differently, I suggest, had he known his client's character.

The disparity between the government's treatment of Mr. Coren's treatment of this cooperator and Mr. Coren himself is stunning. So too, the disparity between New York State's punishment for an offense against its own agencies, and the punishment the federal prosecutors want to impose, is frightening.

Mr. Coren's "co-schemers", for want of a better term, are in a far different position than Steve Coren. In considering "disparity", therefore, the most salient factor to consider is that the government "excuses" the far more culpable cooperators, in its effort to ensnare a target whose life has already been ruined.

## Types of Sentences Available

Factor 3 concerns the "types of sentences available." Now, after Booker, Gall, Kimbrough, and our Circuit's decision in Jones, supra, any kind of sentence is "available". As the PSR notes, probation is authorized by the statutes. The only reason it is not "authorized" by the Guidelines is that the Guidelines (a) did not consider probationary sentences in its empirical study, (b) did not follow Congress' directive to insure probation for non-violent first-time offenders, and (.c) instead chose to focus on factors that could be measured numerically, like "loss" amounts", "numbers" of victims, and the like. Those numbers, of course, do not tell the whole story.

## The Nature of The Offense And Offender

As to the first factor, the nature of the offense and the offender, the Court is aware of the "nature of the offense" – though the words of the testifying witness did not tell the whole story. (Mr. Coren did not allow the case to go even to cross-examination, which would have mitigated the harsh words Your Honor heard on the tapes – words which plunged into Mr. Coren's heart at the time too, giving him the

shock of a wake-up call to the consequences of his zealous conduct).

Your Honor does not yet know the history and characteristics of this defendant other than the brief glimpse into his counseling of clients who used his advice to the disadvantage of others. Steve Coren is not a man whose whole life, or even very much of it, was sitting in a room and advising people how to "screw" others or "game" the system". Far from it.

Those who have known him, some for many many years, tell this Court he is a man of good thoughts and better deeds, upright, conscientious, generous, and honest. The multitudes of letters written by co-workers, family, and an abundance of friends, speak worlds of this man, and they tell the Court also about how Steve has already lost his identity, has been shamed by the seemingly callous words he used with his clients, which Your Honor, and Steve, heard at the trial he aborted by pleading guilty, who has already lost his livelihood and caused chaos in his personal and professional life.

Even with this blemish, Steve Coren's friends love him. Their opinion of Steve Coren has not changed. He is a fallible. He is a man

whose overall and underlying goodness shines through.

I cannot say what others have said any better than they have said it.  So I quote some of the letters that highlight the side of Steve Coren that the Court does not know, and that prosecutors, with their institutional prosecutorial concerns, ignore.

The letters come from people who have known Steve professionally, and those who met him socially, as neighbors or friends engaged in common activities.  Peter Preuss met Steve when Steve needed his home painted.  He wanted to write Your Honor to tell you how decent, how honorable a man, he found in Steve – a man whom Preuss saw reach out to others to help, without compensation, without an agenda other than humanity.

Kathryn Lollis is a business administrator for her church, and the tutor of five young children – a self-described "born-again Christian", with thus a highly different background than Steve.  She writes that she was laid off by her former employer in 1999, and filed a lawsuit believing she lost her job because of racial discrimination.  Steve represented her, and Ms. Lollis writes that it "wasn't just about my

lawsuit, Steven cared about me as an individual." He treated her with great respect, "discuss[ing] many topics such as religion, politics, world events, and our personal lives." Ms. Lollis found Steven a sympathetic ear when her marriage was in trouble. He "constantly reminded [her] of [her] beneficial qualities, which helped build back [her] self-esteem." She writes that in the end, there was an "equitable settlement" of her lawsuit, and she was able to move forward. "Steven came into my life during an extremely difficult period, and I often think of him as an angel of mercy." She hopes that "he reaps the mercy and compassion he has sown."

Licensed Master Social Worker Judith LoSecco, of the Bronx, has known Steve for 50 years, both personally and professionally. He has been assisting her with an employment situation,. She describes him as "compassionate", empathic, and ethical. "He has my complete support".

Gregg Montalto, who lives in New Jersey, is a real estate broker for a company in New York. He met Steve in 1995, and was at that time a 26-year-old relatively new real estate professional. He was

"thrilled" to be given the opportunity to handle management of Steve's rental property, and writes that, though there were "numerous opportunities to "cut corners", charge fees and gain monetary advantage as a landlord in Manhattan, Steve "never considered nor insinuated any unlawful or unethical actions.  His property "attracts young tenants," often professionals at the start of their careers, and Steve "has always treated them with compassion – not charging late fees or increasing their rent if they had financial problems and had to pay their rent late.  In the last few months he allowed three tenants to break their leases without penalty when they were laid off.  Mr. Montalto was "shocked" and "flabbergasted" when he learned of the charges, but his opinion and feelings for Steve "remain unchanged."  He writes: "Judge Vitaliano, I implore you to extend leniency when sentencing this good man.  Though I am unschooled in the methods used in sentencing crimes, I know in my heart and soul that incarceration is not needed in this case, the safety of our community is not dependant on the imprisonment of Steven Coren".

Ruth Mulford is the Regional Vice President of the Empire State

Chapter of the Associated Builders& Contractors, Inc. (ABC), having

retired from a 32-year career as a Vocational Educator/ Administrator.

She has known Steve for 9 years in her capacity with the ABC, of which

Steve held membership for 20 years. "Steve's absence these past 2

years has left a void in the organization. His enthusiasm was

contagious and he was responsible for recruiting more than 50 new

members fo the organization, more than everyone in the country!"

Steve "gave unselfishly of his time". Ms. Mulford has "seen a man

change from somewhat brash and self-assured to subdued, uncertain,

and contrite."

Attorneys who have worked with Steve have written not only

about their admiration of Steve, but about the implications of this case.

James K. Pease, Jr., is a lawyer in practice in the State and federal

courts in Wisconsin, having represented employers for over 40 years.

Mr. Pease notes Steve's "positive contribution" to his profession, always

willing to help less experienced lawyers. Mr. Pease anticipates the

Court's concern with "general deterrence" with the statement: "Steve's

indictment sent shockwaves through the legal profession. ... The

implications of Steve's conviction have been taken very seriously by management labor lawyers from around the country with whom I have spoken. Mr. Pease believes that "this may by the first time this type of conduct has been claimed to be a criminal offense". But he also notes, based on his conversations with Steve, that the impact of this prosecution on Steve has already been "staggering... as well as being humiliating." He asks that you show compassion for this man who has suffered and been punished. "He is a decent human being."

There are far more letters and requests for a sentence of community service – of some sentence that makes sense here – from other lawyers. Kenneth Rose was a classmate of Steve's at Cornell University School of Industrial and Labor Relations, and is now in private practice in labor and employment law in San Francisco. Mr. Rose describes Steve as a person he could always trust, helpful, generous, and committed to his family, a "wonderful person" who "has never been one to shirk responsibility." Mr. Rose describes an incident some time ago water skiing on with Steve on a lake in upstate New York. Steve, says Mr. Rose, is an avid and excellent water skier. "Our

boat accidentally cut the tow rope from another boat.  We could have easily left the scene.  Steve would not allow that.  Steve, who had not been driving the boat, took control, turned the boat around, and drove us back to the other boat.  Steve profusely apologized, unhooked our boat's tow rope, and handed it to the other boat.  Our day of water skiing was over as we did not have another rope."

Mr. Rose also discusses a time when Steve and he jointly represented a seaman who had been poorly treated and terminated by his employer.  "The employer made it clear that we were in for a long expensive battle which concerned me because our client had very limited funds to pay our legal fees. ... Steve persuaded me that as lawyers our primary concern was the client, not ourselves, and that we had made a commitment we were going to fulfill."

It is no doubt this concern with the client that led to Steve's advocacy for his clients, which led him to this Court today.

Steve's family expresses their hope for Steve's future in Your Honor's hands.  Erica Coren is Steve's only daughter.  In terms that should inspire any parent, Erica says that her father is "my mentor and

role model", who has "always made time for me no matter how busy he was building his law practice or how trivial my issue may have seemed at the time."  Writing of her anger in hearing about the charges, recalling the stories he told of cases and how he loves his profession, Erica says: "Watching my father break down in tears in front of me while profusely apologizing for the pain he has caused this family is an image that will haunt me the rest of my life."

Lana Coren, Steve's wife, has "stood by as [Steve] watched virtually everything he has worked for his entire life disintegrate."  She asks the Court to consider the positive tings he has done, and weigh them against his error.  "He has explained at length to his children his mistake." Moreover," she reminds, this case has not inflicted punishment on Steve alone.  Rather, "my family's well being and my business were closely tied to Steve's former practice." They shared office space and staff.  "When Steve had to close his firm, during this tough economic environment, I had to scramble to move my office space, obtain medical insurance for our family, reorganize our financials ... and most importantly, continue [her] accounting practice

as now the sole provider for this family".

Steve "has always been a supportive and loving husband and father. He has taught our children to respect others an set a high moral standard. His teachings were not just words but actions. He always found time to volunteer at the children's school, our synagogue in Brooklyn, and ... civil organizations ..."

Lana writes that their 26-year-old son Andrew is planning his marriage next June, and fears a marriage without his father in attendance. "This is a situation I cannot even imagine," writes Lana. "I ask that you do not impose a prison sentence on a man who has never shown malice to others and has thus far held an exemplary record as a citizen of his communities. I also request that you do not place an additional financial burden on our family. Steve did not receive any benefit from his lapse in judgment."

Andrew Coren, Steve's son, also writes respectfully and hopefully of his father. "The first thing you should know is that he has been and excellent father and role model. In my view he has always strived to be the best mentor, teacher, and friend he can be. ... My father and I enjoy

a close relationship that is a strong bond of mentor, advisor and friend. I do not take this for granted and am honored to have this relationship." Andrew believes that his father's conduct came about though his "creative thinking and desire to help his clients as much as possible", which led to his "misadvis[ing] them to proceed along a course that closely straddled the line between helping oneself and depriving others." His father and his family have already paid a price. He should be allowed to continue mending the relationships with his family that have been strained – but not beyond repair – by this prosecution. Steve's mother, Lucille, who relies on Steve, urges Your Honor to find Steve "worthy of clemency" because Steve is a good person.

Kenneth Kausch is married to Steve's niece and has been in the family for 20 years. Steve "was the first and only member of my wife's extended family to make a real effort to get to know me" and has "reached out" to him continuously. When he was making one of the most important decisions in his life, starting a business, "Steve helped me crystallize my ideas and gave me advice that helped lay a solid

foundation for my company.... His recent indiscretions have not changed my faith in his judgment and character."   Kenneth writes more, about how Steve is an "entertaining teacher", taking time to explain, not lecture, and how he is an "honorable and zealous advocate for the little guy".  Kenneth explains: "Last year I worked with Steve to defend a small business owner accused of polluting a water body by a local regulatory agency.  By doing some simple experiments and straightforward calculations, I was able to determine that the local health department had clearly focused on the wrong person."   Steve "worked tirelessly ... in the face of major opposition from the regulatory agency", and, when in the room at the first preliminary hearing, put Kenneth at ease "by telling me that all we had to do was tell the truth."

***

Eric Su, now working at Foreht Associates LLP, was employed by Coren & Associates, P.C., from 2004 through 2009.  The government may be surprised to learn, or may it already knew but chose not to consider the fact, that Mr. Coren "always advised clients to fully cooperate with the investigative authorities".   Mr. Su reminds that

this mater "is not one where Steve was paid to purposely concoct unsound and baseless legal advice. What Steve was found guilty of doing was the result of his overzealousness as a lawyer." Mr. Su implores that, "[t]o send Steve to prison for what really amounted to malpractice, when he now has lost his ability to practice law, will not be of any benefit ...."

Another young man, Zachary Hollander, was Steve's son's roommate at Cornell University. "Steve is one of the most well liked people I have met since I cam to New York with good reason. There is always another seat, another glass, another bed. His generosity and love the simple things in life – family and good company – have always been on full, unapologetic display."

Friend Desiree Narciso, who lives near Steve in Putnam Valley, met the Corens when they held a gathering to welcome Ms. Narciso and her family to the neighborhood. Steve has always been "warm and friendly", and writes that even her 4-year-old daughter "loves to go to `Steve's house' so that they can have tea parties when we visit. It is actually quite amusing watching him sip from a tiny coup, while sitting

next to a teddy bear!  He takes it all in stride and I'm sure he enjoys every minute of it!"  Steve also helped her family when they discovered structural defects in her home.  When the contractor did not respond, the Narcisos were grief stricken because they lacked the "financial means to pursue any legal action".  Steve "selflessly offered to take our case at no cost to my family".

Acting Supreme Court Justice Loren Baily-Schiffman is also a friend of Steve's and a former neighbor in Putnam Valley.  "Steve is one of the most ethical people I know.  His reverence for the law in many ways defines his personality and his character".  He also is caring and compassionate, lending emotional support when her first husband suffered a heart attack and then through his funeral and mourning period.  Steve has also been a good friend to her present husband, who lost his job a few years ago.  Steve made efforts to help him find work – and more.  Steve is a person of high character and, despite his conviction, Justice Baily-Schiffman believes him an ethical person, whose misdeeds are an aberration.

This view of Steve is universal.  Again, a personal story from

Suzanne Berman, a friend.  She writes that there was a time that she was to meet Steve and Lana for dinner.  She stopped home to change and found that her cat had passed away very unexpectedly.  She was in shock and could not speak through her tears.  Though Steve is "very allergic to cats", as soon as he heard what had happened he took an allergy pill and came to her house immediately to help.  "It is true," Ms. Berman writes," "we are all imperfect beings.  I have yet to meet an individual who has not made an error in judgment at one or more times in their life; myself included. ... I would place Steve in the category of those who learn from their mistakes.  I have watched him struggle through this ordeal and ponder all aspects of what he considers to be his role in all of this.  He does not take this lightly, but rather has been profoundly affected ....  It is this good and essential character trait that allows me to have continued respect, faith and trust in Steve."

I could go on and on.  The writers have said much more, which we know the Court will consider.

In terms of the "character" and "history" of "the offender", the Court will see that the defendant is a first offender who was not

motivated by greed or venality, who committed a crime of zealousness out of caring, who has treated everyone well, worked for his community, helped the homeless and the hungry and who has learned from his mistake, and has been punished.

———————————————

We turn to the final factors in a § 3553 sentencing decision, by which a Court must consider the purposes of punishment: retribution, rehabilitation, specific deterrence, and general deterrence.

THE PENOLOGICAL UNDERPINNINGS OF PUNISHMENT ARE SATISFIED BY A NON-INCARCERATORY SENTENCE

Rehabilitation:   The penological goal of rehabilitation obviously does not support an incarceratory sentence.  Congress has specifically directed sentencing courts that "imprisonment is not an appropriate means of promoting correction and rehabilitation".  18 U.S.C. § 3582(a). Moreover, "rehabilitation" is not a strong factor here:  Mr. Coren's supporters show that this is a man whose work effort and attitude have been uncompromisingly beneficial to society.

Retribution: In terms of "retribution" Mr. Coren has received

enough.  He punishes himself daily with the blame, and shame, of what he did and how he put himself in this situation.   A pound of flesh is not needed to ensure retribution.

Specific Deterrence: The goal of "specific deterrence" justifies incarceration to protect society from individuals who pose a danger. Mr. Coren is not likely to and does not pose a danger to society.  He is an otherwise law-abiding citizen, and will have neither an opportunity, nor inclination, to break the law.

General Deterrence: We turn to the final goal, which is the goal that no doubt gives the Court the strongest concern here.  General deterrence principles instruct the Court to, in essence, send a message if necessary to deter others from committing the offense for which the defendant was convicted.

In this case, the conviction itself, and all that it entails, the ignominy and shame, the loss of license and livelihood, are the strongest deterrents for an upstanding lawyer who is tempted to cross a line.  Indeed, the community has already been warned.

Laurent Drogin, a lawyer who heads his firm's labor and

employment law department, met Steve in 1996 and has worked with him ever since, and has also maintained a social relationship. He writes that his firm has handled many matters in this area. Mr. Drogin says that he will not "try to persuade you that his actions were lawful or justified", but "[w]hat [he] can tell you, and what [he] firmly believe[s], is that Steve has – for as long as I have known him – been a very effective and zealous advocate on behalf of his clients. To the extent that his conduct giving rise to this matter "crossed the line", it was an error of judgment. What the Court should know, Mr. Drogent writes, is that "Steve's case, while terribly unfortunate for him on a personal and professional level, has been noted by the Bar as a call for caution when rendering legal advice in these areas."

Mr. Drogent urges the Court to "spare Steve the need for imprisonment" and also urges that Steve has already suffered economic sanctions of the worst kind:

"... Steve and his family have carried the weight of these proceedings both personally and financially for several years. The loss of Steve's license to practice law is, in and of itself, one of – if not "the"

– worst penalties a professional can suffer.  Further economic sanctions would, respectfully, serve little purpose to the public good, and would be merely punitive as Steve's abilities to earn a living and provide for his family in the future are already compromised by his inability to practice law".

Mr. Drogent reiterates: "As mentioned above, the facts of Steve's case, which have been publicized in the legal media, sound a signal and sound a loud enough deterrent alarm to the legal community as to what behavior crosses the line of integrity. ... [T]he point has been made clear already."

Even where a defendant's conduct is far more clearly "over the line" than here, the "deterrence" rationale of a long jail term, even where a case involves a multi-million dollar fraud, is overstated. Southern District of New York Judge Jed Rakoff, in sentencing securities defendant Richard Adelson, who concealed a multi-million dollar fraud in connection with his public company, commented that there is "considerable evidence that even relatively short sentences can have a strong effect on prospective offenders." <u>United States v.</u>

<u>Adelson</u>, 441 F. Supp. 2d 506 (S.D.N.Y. 2006).

In a case like this one, where this is the first prosecution of its kind, the very fact of indictment and conviction is enough of a deterrent. There is no lawyer who will not be deterred from doing what Steven Coren did. As this Court recognized in finding Mr. Coren's initial motion to dismiss "provocative", many lawyers believed that ERISA might bar enforcement of prevailing wage laws as New York State and the United States Department of Labor now believes they should be enforced.

Once again, the final word has not been written. We shall soon see whether the Supreme Court grants certiorari in <u>Golden Gate Restaurant Assoc. v. San Francisco, California,</u> Docket No.08-1515. The issue of State and local laws regulating benefits is a "hot" one, and the Court is expected by many commentators to take the case.

In the meantime, and especially in view of the uncertainty that has prompted Supreme Court petitions, we urge the Court to be not "lenient", because probation is not a sentence of "leniency" but impose probation as the ~~is a~~ sentence preferred by Congress.

## RESTITUTION SHOULD NOT BE JOINT AND SEVERAL

This Court has the option of designing a restitution penalty when more than one person is responsible for "the offense. Here, restitution should not be ordered on a joint and several basis. As discussed, Mr. Coren did not "gain" on account of the offense. His clients did.

Indeed, they gained by mistreating the employee-victims in many ways. Beig made them kick back prevailing wages and "schemed" in many other ways. Whitley and Torres also "gamed" them. Workers who filed victim impact statements describe wrongdoing in ways having nothing to do with Steve Coren.

It would be consistent with justice to require those contractors to shoulder the burden of restitution.

We understand that some defendants agreed to and/or did forfeit money in accordance with the loss. We suggest that those forfeited funds are best used in restitution. We ask that an individual order of restitution be imposed here.

## THERE SHOULD BE A STAY PENDING APPEAL.

As to any sentence, we ask that the Court grant a stay pending

appeal.  The criteria for release pending appeal are set forth in 18 U.S.C. §  3143(b).  In relevant part, if the court finds (a) by clear and convincing evidence that the defendant is not likely to flee or pose a danger if released; and (b) the appeal is not for purposes of delay and raises a substantial question likely to result in reversal or an order for new trial, then it "shall" release the defendant in accordance with the provisions of §  3142. [Emphasis added].

There is no question that an appeal here will not be taken for delay, and that it raises a "substantial question likely to result in reversal".   The Second Circuit recognized are far back as in <u>United States v. Randell</u>, 761 F.2d 122 (2d Cir. 1985) that, though Congress intended to reverse the then-presumption in favor of post-conviction bail when it enacted §  3143(b), it did not intend to eliminate bail pending appeal.  Rather, where conditions of release can reasonably assure that the defendant will not flee or pose a danger to the community, release <u>should</u> be ordered.  In such circumstances, there is no urgency to incarceration or indeed to any penalty's enforcement, and the public, the taxpayers, and the defendant share the same interest in

resolving the appeal without the expense and hardship of incarceration or financial penalty.

There is no doubt that the question raised on this appeal is "substantial." Your Honor decided two serious motions to dismiss on two legal bases. Both are not "frivolous". Both raise "substantial questions".

Further, the Supreme Court will likely grant certiorari on a case raising similar issues. It would be appropriate to await that Court's views. Even if the Court were not to take the pending case, the Second Circuit will have substantial issues to deal with on this case.

Thus, we ask for a stay pending appeal.

OTHER SENTENCING REQUESTS

We ask the Court to order voluntary surrender – to an institution close to defendant's family home, specifically (if available) Otisville (where kosher food is available) – of a custodial sentence should be ordered. We also ask that any financial penalty be ordered paid after any such custodial sentence is served.

<u>MISTAKES AND UPDATED INFORMATION IN THE
PRESENTENCE REPORT</u>:

We finally turn to errata and updates as to the Presentence
Report.  We have already provided this information to Probation Officer
Amrita Ashok.  We repeat them here.

Paragraphs 32 and 42 both allege that Mr. Coren had the "legal
knowledge" that under ERISA "the United States Department of Labor
[is] pre-empted ... from auditing the concerned accounts".  It is the
State, not the Department of Labor, that is pre-empted.

In the Section "Offender Characteristics", "Family Ties, Family
Responsibilities, and Community Ties", we offer the following errata:

Paragraph 98: Defendant's father passed away in 2001, not 2000.
He had suffered Alzheimers for a long time.

Paragraph 99: Defendant's brother lives with his wife and son, not
"children".  It is defendant's sister, not his wife, who is the other
"woman in the family" with whom Jeffrey, the defendant's brother, did
not get along.

Paragraph 100: Defendant's sister Carol Markman never worked in her father's business. She is a CPA at the firm of Felman Meinberg & Co.

Paragraph 101: When defendant's father retired 20 years ago, the responsibility of his business was assumed by defendant's brother in law, Robert Markman. He retired due to poor health 8 years ago. Defendant's wife Lana Coren assumed the responsibility of Steve's father's business at that time. When she did so, she moved the location of the firm to the same location as defendant's office. The defendant's wife Lana had to move her office at the time defendant closed his legal practice.

Lana's maiden hame is Kuretzky, not Kurtzky, and she is 58 years old. They met while on vacation, not through mutual friends, and married on August 11, 1974, not August 10th.

- Further, she expects her income to be reduced to $41,000. This is due to additional expenses, such as medical insurance and the office expenses previously paid by Coren & Associates. In addition, gross

receipts will be reduced by $20,000.00 in income received from Coren & Associates.

Paragraph 102: Andrew Coren lives with his fiancee. Erica Coren is no longer in the self-study program in Australia – though she remains a good student in college.

Paragraph 103: Defendant lives in the residence used for business purposes during work days, not necessarily "weekdays". At all other times he lives in his other residence. The building in Carroll Gardens is a 3-story house, not a two-story house.

Paragraph 104: This paragraph should read: "The other residence" (non-workdays), not the "weekend" residence. Defendant describes the community as a middle-income neighborhood, not an upper-income neighborhood. Approximately one third of the homes there are "vacation homes".

Paragraph 106 states that the defendant's documents were seized incident to his arrest. We hereby ask the government to return all documents obtained from Mr. Coren, including his passport, to counsel.

*** In the section "Employment Record", paragraph 115 should be changed: contrary to the statement in that paragraph that defendant "did not submit documentation to verify his employment history, in fact the defendant did submit corporate returns showing that the defendant was a full-time and officer and employee of the corporation.

Paragraph 117 should be amended to reflect that defendant's collections for outstanding invoices have been limited. At present he has $200,450.31 in outstanding invoices. Because of the present case, he does not expect collection of most such outstanding balances.

Paragraph 118: The figure in subsection (e) of $16,577.99 is a debt to Foreht Associates LLP, not a loan borrowed from the firm. Subsection (h) should be corrected to show that there is a liability of $20,193.00 due officer. Additional expenses have been incurred since the financials were submitted. These include moving costs of $7,808; refund of retainer, $5,000; New York City taxes of $1,000; and employee medical costs of $4,200. The additional total to date is $18,008.00.

Paragraph 119, the expense chart, is incorrectly copied from that presented: Each box, starting with "Entertainment", is incorrect; the chart in paragraph 119 omits two categories: court reporters/ arbitration fees, and repairs. The entire chart should read

| | |
|---|---|
| Accounting Fees - | $ 20,000.00 |
| Advertising: | $ 3,875.38 |
| Bank Fees: | $ 150.00 |
| Benefits/ Medical | $ 49,783.37 |
| Books, CD, Public: | $ 6,017.45 |
| Computer/ Lexis | $ 1,998.88 |
| Continuing Ed. | $ 9,137.01 |
| Court/Official Fees | $ 11,907.20 |
| Court Reporting/Arb | $ 12,049.06 |
| Entertainment | $ 10,876.34 |
| Equipment Leases | $ 7,787.20 |
| Furniture/Equip | $ 1,455.42 |
| Gas & Tolls | $ 7,241.01 |
| Gifts | $ 2,717.16 |
| Insurance | $ 20,730.33 |
| Messengers | $ 3,000.33 |
| Office Supplies | $ 14,095.73 |
| Parking | $ 4,751.91 |
| Payroll Taxes | $ 24,211.37 |
| Pension | $ 32,000.00 |
| Phone | $ 9,885.19 |
| Printing/Photo | $ 3,094.17 |
| Professional Fees | $ 58,626.00 |
| Rent | $ 64,552.00 |
| Repairs | $ 6,950.18 [this was missing from PSR] |
| Salary | $428,730.77 |
| Travel | $ 8,209.45 |

_____

Total                      $823,837.91

Paragraph 121:The PSR should note that tax returns for "Employers Associates, PC, were submitted for the years 2002-2008.

Paragraph 124: Defendant attended law school from 1974 through 1977.  He was financially supported by his wife.

Paragraph 128:

Bank Accounts (b) - the Fidelity account is jointly owned with defendant's spouse.

Securities (a) - the Fidelity bond is jointly owned with defendant's wife.

Securities (b) - the investment account is jointly owned with defendant's spouse.

'''

Securities (e) The IRA account was inherited by defendant's spouse upon the death of her mother in March 2007.

...

Real Estate

(a) This refers to the "workday" residence as opposed to "primary residence".  The payment of $2,122.05 goes toward amortization and real estate taxes.

(b)  The Putnam Valley house is actually the "primary", not the "weekend" residence.  The defendant pays not $108.33 per month in property taxes, but rather $1,300.00 per month.

( c) The vacation residence is at 19 Intervale, not 9 Intervalle.  The defendant pays $440.00 per month toward amortization, not $400 per month.  He also pays $722.00 per month in real estate taxes.

Paragraph 129 – The defendant actually stated that no such transfers occurred in the previous six months.  Rather, the transfers occurred in 2006.  He stated that his wife demanded the transfers.

Subpart (d): the defendant transferred half ownership of the Morgan Stanley investments, not the full ownership.

Subpart (e): Included in the amounts reflected in these accounts is $288,315.89 inherited by defendant's spouse upon the death of her mother.

Paragraph 130: Subpart (e) should refer to a note, not a loan, of $35,000 from Merrill Lynch/Wells Carson.  This can be payable (not borrowed) at any time.

Subpart (f) - the payment of $14,708 goes toward real estate taxes as well as amortization.

Second Subpart (e) [this follows (f), duplicating letters].  The sum of $390,000 is due to Penn Mutual Life Insurance Company.  The defendant's wife, not his son, is beneficiary.

Second Subpart (f) is also money due to Penn Mutual Life for life insurance.  The wife, not son, is the beneficiary.

Subpart (g) is a debut due to Penn Mutual.

The total liabilities are $1,720,610.22.

Paragraph 136: The additional business income from Employers' Associates is now $62.00 per month, not $4,804 per month.  The household generates $14,800.70 per month in income, not $14,892.70.

-Additional Monthly Expenses:

-Real Estate taxes for Putnam Valley house are $1,300.00 per month, not $108.33.

- Real estate taxes for Vermont are $722.00 per month, not $60.16.

-The amount of $126.17 per month is for medical insurance for the defendant's daughter.

-The TOTAL is $23,516.17, not $21,662.66.

Paragraph 137: This should read: With $14,800.70 in income, and $23,516.17 in expenses, the household has a negative cash flow of $8,715.47 per month. They are using savings. The defendant is hoping to secure employment as a general office manager to a dental practice. Steve Coren's worst days have been these, when he cannot be productive and work.

CONCLUSION

We urge the Court to effectuate Congress's directive in this case, to get past the government's rhetoric and overzealous push for punishment, and to reject the notion that probation is in any sense inappropriate for a first-time, not-violent offender. We urge the Court

to see the irony, if nothing else, in the fact that, for conduct that the State of New York punished as a misdemeanor, federal prosecutors ask this Court to sentence Steven Coren to a 262 month (over 20 years) jail term.

The Court should impose the least sentence "necessary". An alternative sentence, of community service, should be considered. As suggested by Steve's colleague and friend Stephen Cooper, a "Solomon-esque" sentence would involve community service for the employee-side of the labor market, or the NLRB.

Dated: October 23, 2009

<div style="margin-left: 40%;">
Vivian Shevitz<br>
Attorney for Defendant<br>
150 Greenway Terrace - 52W<br>
Forest Hills, New York 11375<br>
914-763-2122<br>
Fax: 888-859-0158<br>
Vivian@shevitzlaw.com
</div>

EXHIBIT   A



About    Donate    Join Us!    Personnel    Press Room    Publications

John Locke

The Heartland INSTITUTE

FREE MARKET SOLUTIONS

Search

Subscribe    Contact Us    Blog    Heartland Store

Home    Education    Environment    Health Care    Infotech    Law    Taxes    Tobacco

Go to:
Taxes Issue Suite

Finance, Insurance, & Real Estate News
Current Issue    Subscription

Health Care News
Current Issue    Subscription

School Reform News
Current Issue    Subscription

Environment & Climate News
Current Issue    Subscription

Infotech & Telecom News
Current Issue    Subscription



## Budget & Tax News

The Heartland Institute's national monthly outreach publication for advocates of lower taxes, balanced budgets, and limited government.

## Davis-Bacon Union Wage Costs Are Reaching Far Beyond Government

**Budget & Tax News > October 2008**
Employment > Unions
Employment > Wages
Email a Friend
Written By: David Y. Denholm
Published In: Budget & Tax News > October 2008
Publication date: 10/08/2008
Publisher: The Heartland Institute

Construction projects across the country cost more than they should because of a Depression-era minimum wage law meant to apply only to federally financed public works projects. The law is being applied to projects that have almost nothing to do with federal funding.

The Davis-Bacon Act's wage requirements kick in at a mere $2,000 of spending. The original threshold was $5,000, but that was lowered to $2,000 in 1935 and has been there since. Had it been adjusted for inflation, the threshold would be more than $30,000 today, still an almost insignificant amount given the costs of most government-funded construction projects.

The act has been applied to a multitude of programs that have little to do with federally financed public works construction. For example, if a program involves federal loan guarantees, construction done with the privately borrowed money will probably be covered by Davis-Bacon.

The purpose of prevailing wage laws is to prevent contractors from undercutting local wage standards. This is considered necessary because of provisions in most public contracting laws requiring contracts to be awarded to the lowest bidder. There is a legitimate concern that a contractor from a low-wage area might submit a low bid and do the job with workers imported from lower-wage areas.

### Collective Bargaining Favored

However, critics of prevailing wage laws argue the wage determination methods favor collectively bargained union wages. Considerable evidence backs their concerns.





Privacy Policy / Site Map

Most prevailing wage rates are determined by voluntary participation in wage surveys. Construction companies with union contracts have a strong motivation to participate in such surveys, while non-union companies have little or no motivation to do so.

As a result, even though the federal Bureau of Labor Statistics' Current Population Survey shows only about 14 percent of construction workers belonged to unions in 2007, union collectively bargained wage rates are frequently determined to be prevailing.

The motivation to participate results largely from the survey method—wages for survey purposes are required to be identical for each craft. In the unionized construction industry, the wages are almost always identical, but in the non-union construction industry workers in the same craft often receive different wages based on factors such as the person's skill level and seniority.

### Fringe Benefits Overstated

The same is true of fringe benefits, which are specified to the penny by prevailing wage determinations. Union fringe benefits for workers in a given area are likely to be identical, while in the non-union segment of the industry the costs can differ widely.

In addition, virtually all union fringe benefits payments go to union funds, which then use the money to provide the benefits. In non-union construction, benefits are paid directly to or for employees. The difference between the two approaches can result in misleading calculations of union fringe benefits.

For example, one benefit workers receive is a payment to a union retirement trust, but if the employee doesn't remain a union member for the required period of time or doesn't work enough hours in a given period to vest in the fund, the employee receives nothing. For a non-union construction worker covered by a 401(k) plan, by contrast, the funds are deposited immediately in the employee's account and become the employee's property.

Unions also calculate as fringe benefits funds that provide little or no benefit to the employee. For example, training funds maintained by the union and used for general training purposes, usually for apprentices, give no direct benefit to the union members on whose behalf they are assessed as a fringe benefit.

Another complicating factor in prevailing wage determinations is job classification. Different unions often claim jurisdiction over different types of work in different areas. Union contracts frequently include various wage levels for different job skills and descriptions.

### Competition Discouraged

An incalculable cost of prevailing wage laws is their impact on competition. There is no question that when there are more bidders on a project, the cost goes down, but many contractors decline to bid on prevailing wage jobs, for a variety of reasons.

Chief among these is the considerable paperwork the Davis-Bacon Act requires in the form of weekly payroll reports. The penalties for mistakes on these reports can be severe, so smaller companies lacking the accounting and legal staffs to deal with this burden often decline to bid.

There is also the issue of paying employees different rates on different jobs. Some companies are reluctant to risk alienating workers by appearing to play favorites when selecting which workers are assigned to the higher prevailing wage rate jobs—so they just don't bid on them.

As construction union density continues to decline, it will be increasingly difficult for these special interests to defend their positions in the face of the obvious waste and discrimination caused by Davis-Bacon and similar laws.

David Y. Denholm (**david@psrf.org**) is president of the Public Service Research Foundation, an independent nonprofit organization that studies labor unions and union influence on public policy.

  

HOME    BENEFIT SUMMARY    FIND PROVIDERS    SPD    FOR

LINKS

CHAPTER TOP    PREVIOUS    NEXT    CONTENTS

# INITIAL ELIGIBILITY REQUIREMENTS

**Bargaining Unit Employees** - If you are a bargaining unit employee, you will become initially eligible on the first day corresponding to the eligibility month in which you first accumulate at least 125 credited hours of employment for wh required to make a contribution to the Fund on your behalf. The date on which you become initially eligible is called date.

**Non-Bargaining Unit Employees** - If you are a non-bargaining unit employee, you will become initially eligible on th benefit month corresponding to the eligibility month for which your employer makes contributions to the Fund on you terms of a participation agreement with the Trustees. (These contributions are reported at the same time and in a m; report covering bargaining unit employees.) The date on which you become initially eligible is called your *initial eligit*

## When Benefits Start (Effective Date of Benefits)

**Employee Benefits** - Your benefit coverage will start on your initial eligibility date.

> *For Example* -If you are a bargaining unit employee and your employer makes contributions for you for at lea; hours for work performed in January, your coverage will start on March 1. Or if you are a non-bargaining unit your employer makes the required contribution for you for work performed in January, your coverage will star

**Dependent Benefits** - If you have dependents on the date your coverage starts, their coverage will start on that san have any dependents on the date your coverage starts but later acquire one or more dependents while you are eligil start on the date they become your dependents.

CHAPTER TOP    PREVIOUS    NEXT    CONTENTS

Descriptions of benefits on this website do not constitute a
guarantee of coverage or payment--all claims are subject to
eligibility and Plan limitations at the time services are rendered.

© 2008 Line Construction Benefit Fund – LINECO
Privacy Policy | Terms of Use/Disclaimer
Powered by MultiEmployer.com

**Initial Eligibility**

Eligibility for employees is based on hours worked for which an employer makes a contrib your behalf to the Fund. You will become initially eligible on the first day of the benefit mo corresponding to the eligibility month in which you first accumulate at least 125 credited h benefit coverage will start on your initial eligibility date. Please make sure that the Fund O your current address so information can be sent to you.

For Non-Bargaining Unit Employees, click here.

**Dependent Eligibility**

Your dependents become eligible for coverage on the same date that you become eligible acquire other dependents after your coverage starts, their coverage will start on the day th become your dependents.

**Lag Month**

Because the Fund office needs to process the contributions sent in by your employer, the month between each month in which you fulfill the eligibility requirements and the month c which you receive coverage. So, if you work 125 credited hours for initial eligibility in Dece your coverage will begin February 1st.

**Continuing Eligibility**

After you establish initial eligibility, you must have at least 125 credited hours per month to covered. As with initial eligibility, there is a lag month; thus, working 125 credited hours in continue your coverage for the month of May.

**Rollback Rule**

The Rollback Rule helps to keep you covered during months when you work less than 12! hours. Under this rule, you will still be eligible as long as you have an average of at least per month going back for a period of up to 12 months.

**Losing Coverage**

Your eligibility will end when both your credited hours for that month and your monthly ave under the Rollback Rule fall below the 125 hour minimum. When you lose eligibility you m to continue coverage for a limited time by making payments under the Plan's Short-Hours Payment program, or under COBRA. If you qualify under total disability rules, you may als to continue coverage.

**Other Eligibility Provisions**

- Eligibility During Disability
- Eligibility During Military Service
- Family Medical Leave Act (FMLA)
- Joint Apprenticeship Training Committee (JATC) Schools
- Eligibility for Weekly Income Benefits
- Eligibility through IBEW Reciprocity
- Surviving Dependent Eligibility


EXHIBIT   B



First Federal Project Labor Agreement Under Obama Administration Riles Senator Gregg

First Federal Project Labor Agreement Under Obama

## Administration Riles Senator Gregg

The first government mandated project labor agreement (PLA) on a federal construction project during the Obama Presidency has been attached to a $10+ million U.S. Department of Labor (DOL) Jobs Corp Center in Manchester, NH (link https://www.fbo.gov/index? s=opportunity&mode=form&id=7db53052ff0be3e0daad18f92af52192&tab=core&_cview=0) . A statement released by Senator Judd Gregg (R-NH) highlights the problems with a government mandated PLA in New Hampshire, where just 8.7 percent (link http://www.unionstats.com) of the construction workforce is unionized ("Gregg: Needless Labor Requirement Will Delay NH Job Corps Center (link http://gregg.senate.gov/public/index.cfm?FuseAction=PressRoom.PressReleases&ContentRecord_id=c99123d4-802a-23ad-4266-030b01a7a3aa&Region_id=&Issue_id=) ," 9/17).

With such a small union workforce available, it makes it virtually impossible for a New Hampshire contracting firm to have unionized employees to fill this requirement. Furthermore, the Department of Labor requests that contractors exhibit three previous successful PLA projects, a request no New Hampshire contractors can meet. And while the Department of Labor has designated this as a small business project, which would normally increase competitiveness for New Hampshire contractors, having the PLA requirement essentially prevents New Hampshire contractors from being able to successfully bid for this $35 million in-state construction project

Senator Gregg stated, "The Administration's decision to discriminate against successful and independent construction firms simply because New Hampshire employees choose to work in a union-free workplace and not bow down to the demands of big labor is extremely unfair to our state. The request for bids issued by the Department of Labor requires that contractors employ a Project Labor Agreement (PLA) and requests they provide proof of completion of three prior PLA projects. However, under these conditions there is not a single firm in our State that would be eligible to bid on this multimillion dollar construction project. In a time of economic hardship, it is simply absurd to discriminate against local contractors and construction workers for the benefit of national labor unions.

"Further, this unfair practice could result in a lawsuit, which would only delay the beginning of construction for this critical project. The Administration's actions on this issue are completely backward. Instead of expediting the construction of a Job Corps Center that will train and equip New Hampshire residents, while potentially creating New Hampshire construction jobs in the interim, the Administration has knowingly placed a roadblock on job training and increased economic activity in the Granite State. I urge the Administration to quickly reconsider this serious lack of judgment so we can get started on this essential project."

The TruthAboutPLAs.com agrees with Senator Gregg's sound evaluation of this discriminatory and costly PLA.

However, according to an article in the *Manchester Union Leader*, union officials disagree with Senator Gregg's assessment of the PLA ("Gregg: Union rule threatens job center (link http://www.unionleader.com/article.aspx?articleId=f4bb6294-7e95-45e3-88db-18bf76e48faf) ," 9/18). The comments of Mark MacKenzie, president of the New Hampshire AFL-CIO, demonstrate an unrealistic and myopic point of view that represents narrow union special interests over those of qualified local non-union contractors and workers that deserve a fair shot at competing for work in their own state paid for by their own tax dollars.

"It may be an out-of-state contractor that bids the work, but it's going to be New Hampshire people who work on the project," MacKenzie said.

Unfortunately, MacKenzie ignores an inconvenient truth about PLAs: local union workers have preference over non-union local workers who are equally as qualified. In addition, typical PLAs give preference to non-local union members over quality local non-union workers. These workers are called "travelers" and unless a PLA specifies that no travelers can be used, union workers from Boston will build this project instead of qualified New Hampshire contractors and their local workforce.

In other areas of the country, unions are quick to criticize the concept of out of state contractors winning local jobs (link http://gazetteonline.com/breaking-news/2009/08/12/local-union-leaders-rally-at-state-contractors-meeting) , but in instances such as this, they conveniently amend their principles to suit their self-serving interests.

According to the article, PLA apologists such as Pat Long, former vice present of the New Hampshire Building Trades Council and a Democratic state representative, unwittingly makes an argument *against* PLAs:

"Under a PLA, a contractor would have to pay $37 an hour for ironworkers.

About $21 would go toward wages and the remainder toward retirement, health insurance and other benefits, he said. A non-union worker would get paid between $25 and $30 an hour, but get no benefits, Long said."

Long is refering to a Basic Truth About PLAs that is offensive to non-union employees and their employers. If a non-union contractor signs a typical PLA, all employer contributions to an employee's health, welfare and other benefit funds must be paid to union managed funds as stipulated in a PLA and applicable union collective bargaining agreements.

Non-union employees will never benefit from employer contributions into union benefit funds unless they join a union and/or become vested in the benefit plans. Benefit plan vesting schedules are much longer than a typical construction project. In short, this scheme is a windfall for union plans because they don't have to account for future liabilities and costs for the contributing non-union employee. What's worse is that PLAs prevent non-union employees from having benefits for the life of a project, unless their non-union employer continues to pay existing non-union benefit plans. This "double payment" of benefit costs is one of the reasons why taxpayers lose with PLAs -non-union contractors can't give their best possible bid for a quality construction project.

PLA proponents often claim that without a PLA, non-union employees would not get health and retirement benefits. That statement is absurd and is a misleading scare tactic. Non-union contractors offer attractive health and benefit packages. How else would they maintain a skilled and competent workforce to build the majority of public and private construction projects? And if non-union contractors didn't offer competitive wages and benefits, wouldn't more than just 8.7 percent of New Hampshire's construction workforce join a union?

In addition, because this is a federal construction job subject to Davis-Bacon wage rates, all contractors, regardless of their union affiliation, have to pay all construction workers in their specific trade (such as an ironworker) a set wage and benefit amount.

If you visit www.wdol.gov (link http://www.wdol.gov) , you can look up the wage rates for a "Building" *Construction Type* in Hillsborough County, New Hampshire and see that the last federal Davis-Bacon Wage determination for ironworkers in that county was made on 3/15/08 and it requires that ironworkers be paid $21.15 in wages and $16.75 in benefits. The total package is $37.90 per hour. All workers have to be paid that amount in cash if a contractor does not offer a benefit program, otherwise, a worker is paid $21.15 per hour in cash and $16.75 per hour in benefits goes into a contractor's existing health, retirement and benefit programs. If employers pay ironworkers less than a total wage and benefit package of $37.90 per hour, they are breaking the law. (An ironworker's salary and benefit totals about $79K per year ($37.90 * 40 hours per week * 52 weeks per year) if there is full year-round employment on a federal construction project in this county.)

Arguments such as, "non-union workers don't get paid a fair wage [even though there is a federal law that addresses this issue], therefore, PLAs are necessary" are fallacies that need to be challenged.

The bottom line is that a PLA on this project is a barrier to much needed jobs for qualified New Hampshire construction employees. Employees should not have to pay forced union dues, obey restrictive and inefficient union work rules and forfeit employer benefit contributions to union benefit and pension plans unless they join a union in order to work on a PLA construction project paid for by their own tax dollars. A PLA will actually prevent a non-union employee from receiving benefits for the life of a construction project.

Senator Gregg is correct. A PLA has no business on this project.

**Update:** View the U.S. DOL's "sources sought" notice for this project (Solicitation Number: DOL099R120791) here (link https://www.fbo.gov/spg/DOL/OASAM/Washington/DOL099R120791/listing.html) . You can view the presolicitation notice (Solicitation Number: DOL099RB20811) here (link https://www.fbo.gov/spg/DOL/OASAM/Washington/DOL099RB20811/listing.html) . The soliciation is scheduled to be published on 10/1.

(link http://www.printfriendly.com/print?url=http%3A%2F%2Fwww.thetruthaboutplas.com%2F2009%2F09%2F18%2Ffirst-federal-project-labor-agreement-under-obama-administration-riles-senator-gregg%2F&partner=sociable)   (link http://twitter.com/home?status=First+Federal%20Project%20Labor%20Agreement%20Under%20Obama%20Administration%20Riles%20Senator%20Gregg%20-%20http%3A%2F%2Fwww.thetruthaboutplas.com%2F2009%2F09%2F18%2Ffirst-federal-project-labor-agreement-under-obama-administration-riles-senator-gregg%2F) (link http://www.facebook.com/share.php?u=http%3A%2F%2Fwww.thetruthaboutplas.com%2F2009%2F09%2F18%2Ffirst-federal-project-labor-agreement-under-obama-administration-riles-senator-gregg%2F&t=First%20Federal%20Project%20Labor%20Agreement%20Under%20Obama%20Administration%20Riles%20Senator%20Gregg) (link http://www.linkedin.com/shareArticle?mini=true&url=http%3A%2F%2Fwww.thetruthaboutplas.com%2F2009%2F09%2F18%2Ffirst-federal-project-labor-agreement-under-obama-administration-riles-senator-gregg%2F&title=First%20Federal%20Project%20Labor%20Agreement%20Under%20Obama%20Administration%20Riles%20Senator%20Gregg&source=The+Truth+About+PLAs+Just+another+WordPress+weblog&summary=The%20first%20government%20mandated%20project%20labor%20agreement%20%28PLA%29%20on%20a%20federal%20construction%20project%20during%20the%20Obama%20Presidency%20on%20a%20Department%20of%20Labor%20(DOL%29%20Jobs%20Corp%20Center%20in%20Manchester%2C%20NH%20A%20statement%20released%20by%20) (link http://www.google.com/bookmarks/mark?op=edit&bkmk=http%3A%2F%2Fwww.thetruthaboutplas.com%2F2009%2F09%2F18%2Ffirst-federal-project-labor-agreement-under-obama-administration-riles-senator-gregg%2F&title=First%20Federal%20Project%20Labor%20Agreement%20Under%20Obama%20Administration%20Riles%20Senator%20Gregg&annotation=The%20first%20government%20mandated%20project%20labor%20agreement%20%28PLA%29%20on%20a%20federal%20construction%20project%20during%20the%20Obama%20Presidency%20on%20a%20Department%20of%20Labor%20(DOL%29%20Jobs%20Corp%20Center%20in%20Manchester%2C%20NH%20A%20statement%20released%20by%20)



EXHIBIT   C

# Rosemar Construction Inc.

## Employee Election to Participate/Decline
## <u>Supplemental Benefits Program</u>

Name of employee: _____

Employment date_____

SSN: _____

As an employee of Rosemar Construction Inc., I understand that under New York State Labor Law §220 or any state rules or statutes requiring the payment of prevailing supplemental benefits, I may elect to either of the following.

## TO PARTICIPATE IN THE BENEFIT PROGRAM:

After careful consideration I have decided:

(Initial here) _____ I elect to have the whole amount of prevailing supplemental benefits required by New York State Labor Law §220 (or any other state rule or statute requiring the payment of prevailing supplemental benefits for my work), paid to Employee Retirement Income Security Act ("ERISA")Trust plans in which Rosemar Construction Inc. participates. I have received a copy of the Rosemar Policy on Supplemental Benefits.

**or**

## TO DECLINE PARTICIPATION IN THE BENEFIT PROGRAM
## AND RECEIVE TAXABLE COMPENSATION

After careful consideration I have decided:

(Initial here) _____ I elect to receive payment as compensation subject to statutory deductions for FICA, Medicare Tax, and Federal, state and other Income Tax Withholding, the whole amount of prevailing supplemental benefits required by New York State Labor Law §220 (or any other state rule or statute requiring the payment of prevailing supplemental benefits for my work). I understand that I am declining welfare benefits and that I have rights to such benefits under Employee Retirement Income Security Act ("ERISA") and this waiver is intended to comply with all requirements imposed by ERISA for waiving such benefits.

_____    _____
Date         Employee Signature

Witnessed by _____

# Rosemar Construction Inc.

## Policy on Supplemental Benefits

It is the policy of Rosemar Construction Inc. ("Rosemar") to participate in certain Supplemental Benefit Plans, one is known as the Contractors Benefit Trust. Through these benefit plans which are ERISA Trust plans, Rosemar employees can obtain comprehensive health care and other non-taxable benefits. Health care, for single or family coverage, is available for all regular full time employees ninety (90) days after their hire. You must enroll within thirty-one (31) days of eligibility.

For complete details as to coverage and cost, consult our Employee Policy Handbook which is provided to each employee upon hire and review the employee benefit booklets which are made available upon eligibility. Medical benefits plan enrollment forms are available from the Office Manager.

Plan coverage includes hospital care, hospital services, surgery, consultations, emergency care and maternity care. There are coverage limits and deductibles which affect reimbursement for medical costs you may incur. Further, in view of the ever changing medical insurance industry, the Company may change insurance carriers, from time to time, if conditions necessitate such a change.

### Employee Elections

1. If you are covered by another health plan, such as your spouse's, and do not need our plan, you must sign a waiver which is available from the Office Manager.

2. In the event you are directed to perform work on a jobsite or project which is subject to New York State Labor Law §220 or any other state rule or statute requiring the payment of prevailing supplemental benefits, it is beneficial to you and Rosemar to pay the whole amount due for such supplemental benefits to ERISA Trust plans described above. In order for Rosemar to obtain full credit under the prevailing wage/supplement laws for the payments to the ERISA Trust plans, in compliance with State Department of Labor rules, you will need to sign an election by which you waive receipt of the benefits in your paycheck (which would be taxable as wages). The election form is available from the Office Manager.

EXHIBIT   D

| CONTRACTORS | OPENING BALANCE 7/1/09 | DISBURSEMENTS (DEBITS) | RECEIPTS (CREDITS) | ADMIN. FEES | | | INTEREST | BALANCE AS OF 9/30/09 |
|---|---|---|---|---|---|---|---|---|
| | | | | IBA | COREN | RESERVE | | |
| **Active Accounts:** | | | | | | | | |
| Amma Construction | $ 11,698.19 | $ 6,906.00 | $ - | $ - | $ - | $ - | $ - | $ 4,792.19 |
| Annex Restoration | $ 7,806.80 | | | | | | $ - | $ 7,806.80 |
| B&A Demolition | $ 9,843.58 | | | | | | $ - | $ 9,843.58 |
| BMJ Construction | $ 8,985.85 | $ 304.47 | $ - | $ - | $ - | $ - | $ - | $ 8,681.38 |
| DCI/Danaco Contracting | $ 47,719.84 | | | | | | $ - | $ 47,719.84 |
| Down To Earth Construction | $ 960.03 | | | | | | $ - | $ 960.03 |
| G. Penza & Sons | $ 28,269.72 | | | | | | $ - | $ 28,269.72 |
| Grimes Contracting | $ 383,698.75 | $ - | $ - | $ - | $ - | $ - | $ - | $ 383,698.75 |
| Hoffman Floor Covering | $ 2,359.16 | $ 5,181.00 | $ 4,009.60 | $ 240.58 | $ 140.34 | $ 120.28 | $ - | $ 686.56 |
| Imperial Development | $ 59,825.04 | $ - | | | | | $ - | $ 59,825.04 |
| Inter-Connection Electric | $ 14,517.40 | $ 15,489.78 | $ 57,932.26 | $ 3,475.94 | $ 2,027.63 | $ 1,737.97 | $ - | $ 49,718.34 |
| KJB Industries | $ 29,112.44 | $ - | $ - | $ - | $ - | $ - | $ - | $ 29,112.44 |
| Lockerworks | $ 922.82 | $ - | $ - | $ - | $ - | $ - | $ - | $ 922.82 |
| MRC II Contracting | $ 2,977.77 | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,977.77 |
| Norco Ltd | $ 1,937.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,937.00 |
| Parkset Plumbing | $ 51.21 | $ - | $ - | $ - | $ - | $ - | $ - | $ 51.21 |
| Preferred Plumbing | $ 2,133.87 | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,133.87 |
| Rasco Contracting | $ 268.45 | | | | | | $ - | $ 268.45 |
| Riley Excavating | $ 95.50 | $ 6,400.00 | $ 7,222.44 | $ 433.35 | $ 252.78 | $ 216.67 | $ - | $ 15.14 |
| Serrot Construction | $ 4,008.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ 4,008.00 |
| South Shore Docks | $ 2,227.47 | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,227.47 |
| Takbeer Enterprises | $ 3,172.41 | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,172.41 |
| Utility Lining Corp. | $ 1,642.21 | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,642.21 |
| Z Restoration | $ 334.49 | $ - | $ - | $ - | $ - | $ - | $ - | $ 334.49 |
| **Subtotal Active:** | $ 624,568.00 | $ 34,281.25 | $ 69,164.30 | $ 4,149.87 | $ 2,420.75 | $ 2,074.92 | $ - | $ 650,805.51 |
| **Inactive/Terminated Accounts:** | | | | | | | | |
| CBE Contracting | $ 1,326.32 | | | | | | $ - | $ 1,326.32 |
| Chesterfield Associates | $ (12,453.32) | | | | | | $ - | $ (12,453.32) |
| Crain Construction | $ 658.68 | | | | | | $ - | $ 658.68 |
| ECLAT Construction | $ 347.31 | | | | | | $ - | $ 347.31 |
| Roof Diagnostics | $ 92.78 | | | | | | $ - | $ 92.78 |
| Thomas Erectors | $ 1,284.49 | $ 1,284.49 | | | | | $ - | $ - |
| **Subtotal Inactive:** | $ (8,743.74) | $ 1,284.49 | $ - | $ - | $ - | $ - | $ - | $ (10,028.23) |
| **TOTAL:** | $ 615,824.26 | $ 35,565.74 | $ 69,164.30 | $ 4,149.87 | $ 2,420.75 | $ 2,074.92 | $ - | $ 640,777.28 |