UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                    :

   -against -                               :          07 CR 265 (ENV)

STEVEN COREN,                                :

          Defendant.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X




MEMORANDUM IN REPLY
ON BEHALF OF DEFENDANT STEVEN COREN
IN ANTICIPATION OF SENTENCING

Vivian Shevitz
150 Greenway Terrace - 52W
Forest Hills, New York 11375
914 - 763 - 2122
FAX: 888- 859-0158
vivian@shevitzlaw.com

# TABLE OF CONTENTS

REPLY IN ANTICIPATION OF SENTENCING . . . . . . . . . . . . . . . . . . 1

    The Loss Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Obstruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    Comparative Sentences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    Less, Not More, "Punishment" Is Called For Here . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# TABLE OF AUTHORITIES

Cases:

Gall v. United States, 128 S.Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . 3

People v. Vanguard Meter Service, Inc., 160 Misc. 2d 685,
    611 N.Y.S.2d 430 (N.Y. Sup. 1994) . . . . . . . . . . . . . . . . . . . . . . 6, 22

Rita v. United States, 127 S.Ct. 2456 (2007) . . . . . . . . . . . . . . . . . . . . . 3

United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) . . . . . 34

United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987) . . . . . . . . . 14

United States v. Bourke, 05 cr 518 (S.D.N.Y., Scheindlin, J.) . . . . . . . 33

United States v. Canova, 412 F.3d 331 (2d Cir. 2005) . . . . . . . . . . 22, 33

i

United States v. Cavera, 560 F.3d 180 (2d Cir. 2008) (en banc) . . . . . 3

United States v. Chatterji, 46 F.3d 1336 (4th Cir.1995) . . . . . . . . . . . 25

United States v. Cole, 496 F.3d 188 (2d Cir. 2007) . . . . . . . . . . . . . . . 15

United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . 2

United States v. Frega, 179 F.3d 793 (9ᵗʰ Cir.1999) . . . . . . . . . . . . . . 2

United States v. Maurello, 76 F.3d 1304 (3d Cir.1996) . . . . . . . . . . . 25

United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) . . . . . . 34

United States v. Schneider, 930 F.2d 555 (7th Cir.1991). . . . . . . . . . 26

United States v. Sisti, 91 F.3d 305 (2d Cir. 1996) . . . . . . . . . . . . . . . . 16

Statutes, Rules, Guidelines, Application Notes

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

18 U.S.C. § 3563(b)(19) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

28 U.S.C. § 994(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 46

Federal Rule of Criminal Procedure 32 . . . . . . . . . . . . . . . . . . . . . 15, 16

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S.S.G. § 2B1.1, cmt. n. 3(f)(v)(III) . . . . . . . . . . . . . . . . . . . . . . . . . 26

    Application Note 3 to Guideline U.S.S.G. § 2B1.1 . . . . . . . . . . . 20

U.S.S.G. § 5F1.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

<u>REPLY IN ANTICIPATION OF SENTENCING</u>

The government remains committed to pressing Your Honor to impose a sentence of 210-262 months in this case.  In urging the Court to adopt its excessively punitive view, the prosecutors urge a sentence ten times greater than the 20-month sentence imposed on Lynne Stewart, for instance, the lawyer who helped her client, the terrorist Sheik, send messages to his followers despite agreeing to strict conditions of visitation. Even if the district court revises Ms. Stewart's sentence on remand, the 262-month sentence pushed by the government -- on the basis of conduct that, regardless of the government's protests, was a misdemeanor in the State whose "interests" are being presumably protected by the prosecution in this case, goes beyond zeal.

The government, indeed, urges a sentence without regard to principles of sentencing.  It advises the Court, on a number of occasions of the appellate standards for reviewing a sentence, as opposed to discussing the 3553(a) standards that the district court is bound to apply.  It asks the Court in essence to presume that the Guideline

sentence is "correct" and that there is no reason not to impose it.

In "distinguishing" an obviously-relevant case, <u>United States v. Frega</u>, 179 F.3d 793, 811 (9th Cir.1999), where the Court held it proper not to apply a managerial enhancement as to the defendant-attorney with a far greater "managerial" role than Mr. Coren's in this case, the government offers the simple statement that the case is "non-binding" in that it is "from another circuit", and that it "has little precedential value because in the Ninth Circuit observed that `the call could go either way'". (Gov. Mem. p.53-54).

The government does not discuss the facts of <u>Frega</u>. Instead, it "suggests" that Your Honor should impose an enhancement even if it has no sound basis or might be rejected as a matter of lenity because the appellate court will review the sentence on an "abuse of discretion" standard. The Court should not be imposing a sentence based on whether it will get reversed or not. It should be imposing a sentence that is "sufficient" and "not greater than necessary". <u>United States v. Fernandez</u>, 443 F.3d 19, 27 (2d Cir. 2006) (there is "no presumption, rebuttable or otherwise, that a Guideline sentence is reasonable"). See

<u>Gall v. United States</u>, 128 S.Ct. 586, 596-97 (2007) (a district court

"may not presume that the Guideline range is reasonable"); <u>Rita v.</u>

<u>United States</u>, 127 S.Ct. 2456, 2465 (2007) ("the sentencing court does

not enjoy the benefit of a legal presumption that the Guidelines

sentence should apply").  Accord,  <u>United States v. Cavera</u>, 550 F.3d

180, 188-89 (2d Cir. 2008) (en banc), ruling that a"district court may

not presume that a Guideline sentence is reasonable; it must instead

conduct its own independent review of the sentencing factors, aided by

the arguments of the prosecution and defense", and writing:

> A sentencing judge has very wide latitude to decide the
> proper degree of punishment for an individual offender and
> a particular crime. In addition to taking into account the
> Guidelines range, the district court must form its own view
> of the "nature and circumstances of the offense and the
> history and characteristics of the defendant." 18 U.S.C. §
> 3553(a)(1). The sentencing judge is directed, moreover, to
> consider: a) the need to reflect the seriousness of the offense,
> to promote respect for the law, and to provide  just
> punishment for that offense; b) the need to afford adequate
> deterrence to criminal conduct; c) the need to protect the
> public from further crimes by the defendant; and d) the need

for rehabilitation. Id. § 3553(a)(2). Additionally, district courts must take into account: the kinds of sentences available, id. § 3553(a)(3); any pertinent  Sentencing Commission policy statement, id. § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, id. § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, id. § 3553(a)(7).

Similarly, the government invokes the appellate "great deference" standard, citing another pre-Gall case, United States v. Hirsch, 239 F.3d 221, 226 (2d Cir. 2001), in urging this Court to deny acceptance of responsibility credit because we have argued that he acted without criminal intent to violate the federal mail fraud laws and "only pled guilty after several days of damning trial testimony".

His post-plea motion to withdraw his guilty plea should not be held against him in this regard because he acted on present counsel's advice that there was (and I submit there still is) a sound basis to challenge the application of federal mail fraud to this indictment.  The government's argument for denying acceptance points  (Gov. Mem. 56)– that Mr. Coren "never `intended to deprive the Government agencies of

money or property'" – in no way obviates his acceptance of responsibility for violating the prevailing wage laws.

As discussed in the somewhat lengthy footnote below, one of the cases brought to light only now by the government actually supports the claim we will raise on appeal – that a prevailing wage violation does not implicate a "theft" of government "property". (The government, we think, should have cited this previously).

Thus, at page 62 of its memorandum, the government argues that Mr. Coren's "attempts to liken his scheme to New York State misdemeanor offenders" is "irrelevant and misguided" for a "number of reasons". That a State's classification of a crime would be "irrelevant" especially where the State is the "victim" is a bewildering suggestion. That it is "misguided" to argue that the conduct was a misdemeanor at the time is twisted.

The government acknowledges that the Labor Law was amended in 2008, at which time the felony was enacted. But it argues that we "ignore[] the fact that New York State can and has prosecuted prevailing wage violations as various felonies, including perjury and

larceny".  The case it cites, <u>People v. Vanguard Meter Service, Inc.</u>, 160

Misc. 2d 685, 698-699, 611 N.Y.S.2d 430, 439-40 (N.Y. Sup. 1994), is

revealing.  It supports our view that obtaining a contract while

"wrongfully" asserting compliance with prevailing wage laws does not

amount to larceny of the contract amount (because it does not deprive

the contracting party of its property.)

The government is correct in only one respect:  One larceny

charge was upheld in <u>Vanguard Meter</u>.  But the sustained charge

alleged a "scheme to defraud" workers out of hourly wages they should

have received under the prevailing wage law, Labor Law 220, by

advertising an hourly wage and then paying them less at the lower

piecework" rate", having deceived these workers by false

advertisements concerning the rates that would be paid and obtaining

their services by fraud.

At the same time this "scheme to defraud" charge was upheld, the

Court dismissed charges alleging that the defendants (municipal water

meter installment contractors)  violated the larceny statutes for having

"stolen government contracts" by falsely claiming that it was paying

prevailing wages. The Court held that the larceny statute does not apply to obtaining contracts or contract amounts, because a party to a contract cannot steal that contract. Moreover, the State court observed, there was no pecuniary loss to the water meter agencies.

The Court described the "thrust" of the indictment as charging that "defendants never intended to comply with the prevailing wage and pre-plumbing master plumber requirements" of the contract, and also noted the contractual provision that "strict compliance" would be required and that failure to comply would result in default. 160 Misc.2d at 689-690. The Court noted that the defendants also had "arranged with a licensed plumber to falsely make it appear that a licensed plumber was supervising pre-plumbing work" and that defendants had "submitted false and perjurious forms to the City certifying they had complied with the contracts". Id. at 690.

The Court dismissed these larceny counts charging theft of contract and contract amounts. It upheld only the charge alleging a scheme to defraud the workers of "money, labor and the right to be paid the prevailing wage." The Court held that the "scheme to defraud"

statute in New York – the statutory basis for the charge that the defendants "defrauded" the workers – went farther than "property" rights; rather, it included labor.   It wrote that "the definition of property" for purposes of applying the "scheme to defraud" statute in New York  is not limited to the definition under the larceny statute" but rather is broad enough to encompass the services provided by the installers" (611 N.Y.S.2d at 435).

As to the two larceny charges that mirror the mail fraud charges here, the Court wrote:   "In order to apply the larceny statute to the contracts here, the contracts must be `property' within the meaning of the larceny statute."  <u>Id</u>. at 436, citing Penal Law 155.00(1).  The Court held that a "contract is nothing more than a bundle of rights which the law will presumptively confer upon two parties who complete the rituals for `formation' of a contract".  A contract "does not exist independent of that relationship.  "Viewed in this context, the court must conclude that a party to a contract ... cannot steal that contract." (<u>Id</u>.).  As to the companion larceny-by-false-pretenses count, the Court noted that that charge" requires criminal intent to deprive and defraud

the owner of property ....." The Court continued: "In the counts at issue, the alleged victim is the City of New York, and the property alleged to be stolen is the full amount of each check paid to Vanguard under the 12 installation contracts. Representations to the City that Vanguard had paid its meter installers the prevailing wage as required by the contract, and that pre-plumbing work had been performed under the supervision of a master plumber are alleged to be false."

The Court observed that the prosecutors had not even attempted to respond to the line of authority that we cited also in our post-plea motion to dismiss in this case, "merely argu[ing] that had [the City] known the true facts as to Vanguard's conduct with respect to prevailing wages ... they would not have paid Vanguard at all." (Id. at 437.) This, however – said the court – is "frequently the posture of a party that has received most of what it bargained for in a contract." Id.

The Court agreed that in dealing with municipal contracts, there may be alterations of civil rules of quantum meruit.." But, it continued, "more serious concerns are raised when the People seek to charge the contractor with theft." In words the government should have cited in

9

opposition to the motion to dismiss, we submit:

> "To adopt the People's theory would mean that any
> time a party contracted with the City, delivered the essence
> of the performance at a price which is in no way inflated, but
> did not perform strictly in accordance with the methodology
> agreed upon, that contractor would be guilty of stealing the
> entire contract price. .... The court declines to adopt such an
> expansive reading of the larceny statute. Indeed, to do so
> would constitute a dangerous expansion of the larceny
> statute". [Id. at 437.]

So the prosecution is correct here: the State has charged prevailing wage violations under other laws. But the government did not charge that this was mail fraud where the workers were "victims", no doubt, in part, because of the lack of deception and other problems that simply take this conduct out of the realm of section 1341.

The fact that the court upheld prosecutions against contractors for offering a false instrument for filing in Vanguard does nothing to

rebut the plain truth that at the time of Steve Coren's misconduct, criminal violation of the prevailing wage law constituted a misdemeanor. The fact that the State court held that a party could not "steal" the contract or the full contract sum, even from a municipal agency, by misrepresentation, are "facts" that this Court should not "ignore". These are not arguments that "misguided and irrelevant" (Gov. Mem. 62). They are highly relevant in determining what sentence ought to be imposed in such instance.

To induce this Court to ignore these principled factors, the government argues that "regardless" (whatever that means), the effort to compare Steve Coren's conduct to a New York State misdemeanor is a "red herring". The government trumpets that "Coren's crime is in a class by itself". (Gov. Mem. 63).

This is ridiculous. That Steve Coren was a lawyer aiding and abetting a prevailing wage violation may result in abuse of trust points, but it does not make the crime any different.

At bottom – and as the government argued in opposition to the pretrial motion to dismiss – this is a prevailing wage case, not a crime

of unknown origins or "in a class by itself".  That Mr. Coren is a lawyer who violated prevailing wage laws by using an ERISA fund, does not make it any worse, except to the extent that an abuse of trust enhancement may be applied to a federal Guideline level.

The fact that the State opted not to charge any crime in this case is not "irrelevant".   It should speak volumes.  Indeed, the fact that the State (or federal?) authorities knew, since the 2001 recorded conversations between Whitley/Torres, of the prevailing wage violations and chose not to prosecute until 2006 suggests that this crime was in a "class" of crimes that was not prosecuted at all..  Indeed, one has to ask whether it is the Department of Labor and the State that occasioned losses to prevailing wage workers by "sitting on" the case for 5 years after securing the Whitley/ Torres tapes in 2001. Surely, the State's argument that it was "deceived" when it knew what was going on, is dubious.

The Loss Amount

As to loss amounts, the government's response is twofold: First, it argues that the loss amount is "accurate, reasonable and conservative"

(Mem. p.13 et seq.), and argues that it is "okay" that it refused to tell us the basis of its loss calculations because a court "need not establish the loss with precision" (id.). Second, it argues that because Steve Coren is a bad guy and made terrible statements when being taped, the Court should ignore principles of fair notice about sentencing issues and should, indeed, count the entire contract amounts in the loss figure.

The prosecutors seemingly acknowledge that counsel asked the government on numerous occasions for back-up and methodology, but propose that because they tell the Court now the basis for the numbers, we should have no objection. The government assures that its loss amount is "accurate" (Heading, Gov. Mem. 13).

The point I tried to make is that we were given no way to even evaluate that assessment, to agree or disagree. A defendant should not have to "take the government's word".

Instead of responding to this reasonable claim, the government addresses the standard for establishing a loss amount and for appellate review. (Gov. Mem.13-14). Whatever the standard may be, the argument does not address our concerns.

Our concern was, and is, getting information about how the numbers were reached, what specific data were used, what methodology was used for computations, and what was included and excluded, and why. Just giving us the summary chart, as it did, and telling us that its figures come from documents we received at some point, is not enough. Cf. United States v. Bortnovsky, 820 F.2d 572 (2d Cir. 1987) (reversing conviction and agreeing that defense was hindered in preparation of case where government refused to specify documents alleged to be false, instead telling defense that the information was within over 4,000 documents provided to to defense counsel during discovery.)

The government now tells us, for the first time in its responding sentencing memorandum, the specific documents upon which it relied to arrive at the "summary chart". That summary chart was the only document specified previously. For the first time, now it identifies, for instance, that the back-up documents it used were GX 2377-2538A, 3300, 3301, 3302, 3303, and 157-210 in calculating losses as to All American/ Serrot. (Gov. Mem. 16). And for Takbeer, the government

identifies different trial exhibits specifically – none of which it deigned to identify when we asked well prior to sentencing. (See Gov. Mem. 17-18, specifying that the government "supplied the `back-up' documents supporting the loss figure during discovery and marked as trial exhibits, to wit: GX 1084-1231A, 3304, 3305, and 3306.)

This is not enough time to investigate. We are quickly preparing a reply to the government's memo in anticipation of a very important sentencing, The government had an obligation to provide its backup at a time when we could investigate it properly.

Sentencing is, of course, as important as trial, if not more so. In United States v. Cole, 496 F.3d 188, 194 (2d Cir. 2007), the Second Circuit made clear that sentencing is part of the "adversary process" and that a defendant must have an opportunity to address any factual matters presented to the Probation Department by the government – well prior to sentencing. It wrote: "Rule 32 in general--and subdivisions (f) and (I) in particular--is intended to provide efficient and `focused, adversarial resolution of the legal and factual issues . . . to ensure that a defendant is not sentenced on the basis of materially untrue

statements or misinformation.' United States v. Sisti, 91 F.3d 305, 310 (2d Cir. 1996) (citations and internal quotation marks omitted)."  In 1994, Rule 32 was revised "to reflect greater emphasis on a defendant's right to argue objections to the district court at the sentencing hearing. [n5] Id. at 12.  The Conference shaped both these provisions to `maximize judicial economy by providing for more orderly sentencing hearings while also providing fair opportunity for both parties to review, object to, and comment upon, the probation officer's report in advance of the sentencing hearing.' Id. at 11; ..."

Unsurprisingly, as the <u>Cole</u> Court stated: "The case law confirms this understanding of Rule 32's purpose. See Sisti, 91 F.3d at 310 ("A defendant must have an opportunity to assure the accurate presentation of reliable sentencing information to the district court." (citations and internal quotation marks omitted)); ... ("the sentencing procedures laid out by Rule 32 are designed to narrow the issues and provide due notice") ..."

We are concerned by the government's admissions in its Sentencing Memorandum now that certain of its calculations were

wrong. For the first time now, the government tells us (in footnotes and parentheticals, e.g., Mem. 15 n.3) that the PSR did not have accurate amounts. It assures that the differences in loss amounts are based on the government's "re-checking" (id.) and its "removing certain losses".

It is not enough to tell us now that there were "errors". We have a right to pre-sentencing testing of the government figures – even if we arrive at the same figures. That is the adversary process.

The government's calculations also seemingly depend not only on a methodology and use of certain documents in a way not disclosed to us, but also rest in large part on the accuracy of the documents submitted during the course of the events by the principals of All American/ Serrot and of Takbeer. Those principals did not submit honest reports. It cannot be assumed that their statements to the government are candid and honest. Their dishonesty went beyond merely checking the box that said they had complied with prevailing wage laws. Their CBT contributions, for instance, may have included workers' names who did not work, or the like. The point is: We have

had not had a chance to scrutinize the government's loss figures in the way the adversary process requires. That is all we are saying. The government's figures are different now than as provided to the Probation Office, which merely accepted the government's figures without its own investigation. Telling us now, as the government says at p.15 of its Memorandum, "How the Government Arrived at Its Loss Calculation", is not quite enough.

Plainly, its "extra" numbers should be ignored. The government flaunts the law when it argues that, despite the lack of criminal intent on the part of Rosemar's owner – which caused the government not to charge Rosemar's principals with the same offenses here, "[i]t is of no moment" (Gov. Mem.20). Why is it of no moment?

As discussed in the initial Sentencing Memo, Steve Coren was an aider and abettor of contractors' primary offenses here. Without criminal liability on the part of the principal, there is no liability on the part of the aider and abettor.

The government does not cite, much less discuss, the case we cited in our Sentencing Memorandum, <u>United States v. Shafer</u>, 199

F.3d 826, 830-31 (6th Cir. 1999) – holding that in a Davis-Bacon case prosecuted under 18 U.S.C. § 1001, non-criminal conduct is not "relevant conduct", stating: "There is a difference, however, between conduct that does not lead to a criminal conviction for technical reasons, such as criminal activity that was not included in an indictment or criminal conduct for which the statute of limitations has expired, and conduct that could never lead to a criminal conviction because the conduct is not of a criminal nature. Indeed, we believe the Sentencing Guidelines simply do not provide for the consideration of conduct under § 1B1.3(a)(2) unless that conduct involves an offense that could lead to a criminal conviction resulting in prison time.)

Again, the government's position is that the "principal" contractor of Rosemar did not have criminal intent to deprive workers of prevailing wage benefits. There is no "principal", and thus Mr. Coren cannot be liable as an aider and abettor of Rosemar's non-criminal conduct.

Nor does it satisfy the law for the government to merely say that "Rosemar's principals have acknowledged that while they did raid the

CBT, they did so at Coren's advice."  (Gov. Mem. 20).  First, they did not "acknowledge" violating the prevailing wage laws.  Second, there is documentary proof, Exhibit "C" tor our initial Sentencing Memorandum, that Mr. Coren prepared a notice for Rosemar's workers advising them of their right to elect to obtain cash payments instead of participating in the benefits plan.  Steve Coren did not participate in any deception on the part of Rosemar.  He is not responsible, criminally, for any "losses" the government may now try to attribute to him.

The government also argues that its loss amount should be accepted because it could have charged the full amounts paid on the contracts.  That would be totally improper.

The agencies did not have any identifiable pecuniary loss from the conduct at issue in this case.  Application Note 3 of the relevant (but non-mandatory) Guideline, U.S.S.G. § 2B1.1, defines loss to mean only "pecuniary"loss, i.e., loss measurable in monetary terms.  It provides:

3.     Loss Under Subsection (b)(1).-This application note applies to the determination of loss under subsection (b)(1).

(A) General Rule.-Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.

(I) Actual Loss.-"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

(ii) Intended Loss.-"Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

(iii) Pecuniary Harm.-"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm. [emphasis added]

The prosecutors' effort to "instruct" the Court to use non-pecuniary loss, i.e., the entire contract amount, is a misguided effort to pervert the Guidelines just to increase punishment wrongfully.

Steve Coren did not foresee, did not cause, and did not steal

anything of monetary value to the "victim"-agencies who paid on their contracts. The case unearthed by the government and discussed previously in this memorandum, People v. Vanguard Meter Service, Inc., 160 Misc. 2d 685, 611 N.Y.S.2d 430 (N.Y. Sup. 1994), makes that clear. It held that there is no pecuniary loss of the contract amount to the City that gets the building it wanted built, even if it paid on a contract where the contractor did not pay prevailing wages.

The government, which ignored the real holdings in Vanguard, tries the back-door route, citing a case distinguishable on fact and principle . Thus, the prosecutors urge that under United States v. Canova, 412 F.3d 331 (2d Cir. 2005), the Court can determine that the entire contract amount is the proper loss amount because in that case, the Court held that the loss amount included the entire amount of a contract for the testing of pacemakers, because the contract specified certain tests and they were not performed as specified. Unbuckling the mere holding in Canova from its facts does a disservice to this Court's role here.

In Canova, the Court rejected an argument by the defense that,

though testing was not performed according to specifications, those tests were as valuable because they were "as clinically sound as the tests required by Medicare" and so "the government did not sustain any loss." (Gov. Mem. 24, citing 412 F.3d at 351-56.)

The government quotes the Second Circuit's opinion that "it is not the task of a sentencing court to second-guess the victim's judgment as to the necessity of those specifications." (Gov. Mem. 24, citing 412 F.3d at 352 (emphasis added). But the case is quite different because Medicare required certain tests and was going to have to pay some value to remediate and the mis-performed contract.

Canova dealt with specifications required to insure that pacemakers would function correctly – not with a specification collateral to the product as is the case here (how workers are to be paid for a product conforming to all product specifications). It was only in this context – in the pecuniary value of an incident of a contract that was not performed correctly – that the Court of Appeals held that a sentencing court could not "second-guess" the propriety – the value – of those specifications or deem them not to have contributed to pecuniary

harm.

In so holding, the Court of Appeals explained that pecuniary loss might be non-existent (or very small) where a "victim" had to make only minor expenditures to "fix" the errors of a specification's breach. It wrote, in words applicable here (with our emphasis added):

> "To the extent defendant adduced evidence that the tests performed by Raytel were as clinically sound as the tests required by Medicare, this fact does not mean that the government sustained no loss from the charged fraud. Canova's fraudulent representations did not, after all, pertain to the clinical value of the tests performed, see U.S.S.G. § 2F1.1, cmt. n. 3(a); they pertained to the particular test specifications being performed, see id., cmt. n. 3©. When a party fraudulently procures payment for goods or services by representing that they were produced or provided according to certain specifications, it is not the task of a sentencing court to second-guess the victim's judgment as to the necessity of those specifications. Whether the testing time on a pacemaker, the number of rivets on an airplane wing, or the coats of paint on a refurbished building is a matter of necessity or whim, the fact remains that the victim has been induced to pay for something that it wanted and was promised but did not get, thereby incurring some

measure of pecuniary "loss." See United States v. Bhutani, 266 F.3d 661, 670 (7th Cir.2001) (ruling that loss calculation did not depend on whether defendant's fraudulent adulteration of a drug in fact had an adverse medical effect; "there was a loss because consumers did not get what they bargained for"); cf. United States v. Maurello, 76 F.3d 1304, 1314 (3d Cir.1996) (noting that a victim who contracts to have a building constructed "according to certain specifications" and receives "the services for which he bargained" sustains no loss "despite the fact that he has received them from a person who was not legally authorized to offer them" ...... [emphasis added]

In a distinction relevant to the facts of this case, the Court continued (with our emphasis added):

United States v. Chatterji, 46 F.3d 1336 (4th Cir.1995), discussed at length by the parties, is not to the contrary. In that case, the Fourth Circuit concluded that a defendant's fraudulent representations to the Food and Drug Administration ("FDA") to secure approval for a particular drug did not cause any loss to consumers because the marketed "products were exactly what they purported to be." Id. at 1341. Under the circumstances, the court viewed the fraud as purely "regulatory"; nevertheless, it expressed

"little doubt that economic loss would exist" if "a drug with fraudulently-obtained FDA approval ... is something less than it is represented to be." Id. at 1342; see also U.S.S.G. § 2B1.1, cmt. n. 3(f)(v)(III) (now providing special rule for loss calculation in cases involving regulatory approval obtained by fraud). In this case, the tests for which the government paid Raytel millions of dollars were not "exactly what they purported to be," i.e., 30-30-30 tests, but "something less" with respect to the specified production of thirty seconds of magnetic tape in the final test phase. Similarly distinguishable is United States v. Schneider, a case finding no loss to a victim where the defendant procured a contract by fraud but thereafter performed "to the perfect satisfaction of the contracting agency." 930 F.2d 555, 558 (7th Cir.1991). In this case, Raytel did not perform to the "perfect satisfaction" of the government. Instead, the very essence of Canova's fraud scheme was to conceal from the government the fact that Raytel was not performing pacemaker tests according to Medicare specifications in order to induce payments that would otherwise not have been made.

Continuing its discussion of pecuniary loss, the Canova Court wrote that loss is measured by what it takes to make "substitute" transactions or for "handling" the product produced, to make it what it

purported to be – a concept missing in this regulatory prevailing wage case:

> This does not mean that a victim's loss in a substitute goods or services case necessarily equals the full contract price paid. The Guidelines suggest that, in such cases, loss is properly measured by looking to the "reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered or retrofitting the product so that it can be used for its intended purpose," plus the "reasonably foreseeable cost of rectifying the actual or potential disruption to [the victim's] operations caused by the product substitution." U.S.S.G. § 2F1.1, cmt. n. 8©. In some circumstances, product adjustments may so easily be accomplished that the fraudulent substitution causes the victim only a small loss. In other circumstances, where the goods or services must be recommissioned, the loss may be considerable. But in no case do the Guidelines contemplate a court rewriting the parties' contract to excise specifications paid for but not received and, thereby, concluding that the victim sustained no loss."

Canova thus concerned a product that was not as it was purported to be, and does not support the government's assertion that a breach of

contract involving how and what workers received in fringe benefits implicate pecuniary loss to the agencies who contracted for the work. Any "loss" is that to workers, and the "loss amount" is limited to criminal conduct for which the defendant is liable.

Finally, as to losses, the government apparently believes that Mr. Coren's attempt at arguing concerning his focus of the offense – that is, his focus on the financial benefit to his clients as opposed to workers' "losses" – allows the prosecutors to "pull out the stops" and use Mr. Coren's statements during proffer sessions to support its "loss" theories (and to impassion the Court further). The proffer agreement provides, as the government states, that the proffers could be used as "substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [Coren] at any state of a criminal prosecution (including but not limited to . . . sentencing)." Proffer Agreement at ¶ 3, quoted at Gov. Mem. p.26 n.10.

We submit that nothing in our argument constituted a "factual assertion" or the "offer" of "evidence" that triggered the government's right to use statements from his proffer statements. We were arguing

from facts in the record already and their inferences, not from new factual assertions or evidence.

Despite the government's misuse of proffer statements, despite its focus on the defendant's completely offensive words in talking bravado with his clients, in applauding his own ingenious legal maneuvers that he thought could be used to support (or get around) his clients' taking of benefits, the bottom line remains the same. The defendant acted to "help" his clients pull money out of the benefits fund. Two of the clients were criminally responsible for violating the prevailing wage laws. Mr. Coren is responsible only for his part in that criminal conduct.

Obstruction

As to "obstruction", the government blurs the line, urging Your Honor to draw an inference that the government declined even to charge, much less to prove. Mr. Coren admits that he stupidly answered, "go ahead", when his client Beig was put up to trapping him into a legal decision on whether he should get rid of a USB flash drive. Thus, the government now writes, "Beig and Khalid-Hussein cooperated with the investigation immediately" (hardly surprising since

a search warrant was executed at their premises and they had been participating in wrongdoing far beyond prevailing wage violations), and "told the government that, upon hearing about the impending search warrant, they sought the defendant's counsel." (Gov. Mem. 9). According to the government in its memorandum now, "They told the government that Coren advised them to `get rid' of incriminating documents ... , advised the destruction [emphasis added] of `everything that you don't want them to see.'" (<u>Id</u>.)

That is not what happened. According to their own 3500 material and to the proffers that the government decided it is "right" to use, defendant did not advise Beig to "destroy" everything. Rather, as indicated by the conversation quoted at page 11 of the government's memorandum and in 3500 material of Beig and Khalid, defendant did tell those clients, prior to the federal warrant, and after "some" documents had been provided to the Inspector General of the School Construction Authority several months earlier (Gov. Mem. 11), that they should take documents out of the office. He did not tell them that they should destroy them.

There had been no federal warrant, nor any criminal investigation out of which any subpoena had been issued for those documents. Thus, indeed, this "removing documents" advice was not charged against Steven Coren as obstruction in this case.

Yet now, at sentencing, the government misstates the facts ("misleads", to use the words the prosecutor uses in describing our argument that prevailing wage violations were but a misdemeanor at the time of the offense conduct), now saying – flatly incorrectly – that Mr. Coren had told Beig prior to the time the defendant actually knew of the federal investigation through execution of the search warrant that he should "destroy" everything.

He did not do so. Mr. Coren admitted that (as shown in the taped conversation), in the middle of Beig's telling Coren about the federal seizures and that he had a flash drive of the documents that Beig did not need, he did agree that Beig could get rid of the flash drive. He admitted, too, that whatever was on that flash drive could have been "used" "in the investigation". He did not admit, and the government did not ever even seek to prove, that Steve Coren told Beig or any of his

clients to destroy original documents.

These may be "nuances", but they are nuances with a difference. The government did not charge Steve Coren criminally with advising the clients, pre-warrant, to move the documents. The government is wrong to impassion the Court now with innuendo concerning that same incident of Mr. Coren's conduct.

Comparative Sentences

The government's tactic in urging a sentence of 210-262 months, and telling Your Honor that that is a "reasonable" sentence, not only ignores 18 U.S.C. § 3553(a), not only paints the defendant as the worst villain in history when this was a small fraction of who this man is, but also turns a blind eye to the fact that the sentence it urges is far out of whack, so to speak, with other sentences and with the trend of those who think about our criminal laws and eschew "overcriminalization" of conduct that ought to be treated under the civil laws.

First, Judge Shira Scheindlin recognized, in the recent sentencing in a high-profile Foreign Corrupt Practices Act case where the defendant, Bourke, "consciously avoided" knowledge that he was

participating in the bribing of Azeri officials to gain a controlling interest in a State oil company, that the government's sentencing recommendation – 10 years – was unnecessary and over punitive. Citing (inter alia) the statute we mentioned in our initial Sentencing Memorandum, 28 U.S.C. § 994(j), which embodies Congress' directive that first time non-violent offenders should be generally given a probationary sentence, Judge Scheindlin sentenced the defendant to a year and a day in United States v. Bourke, 05 cr 518 (S.D.N.Y., Scheindlin, J.).

In Canova, 412 F.3d 331 (2d Cir. 2005), discussed above (and cited by the government to try to tag Mr. Coren with the entire contract amount by way of "loss"), the sentencing court imposed a sentence of one year's probation for a multi-million dollar Medicare fraud. The Court of Appeals remanded for consideration of loss amount, but otherwise affirmed the court's decision to impose a non-Guideline probationary sentence to reflect the defendant's "good works", as well as the district court's decision to not impose a perjury enhancement.

In other cases, the government itself recognized and rejected

draconian sentencing levels that do nothing but over-punish. One notable case is <u>United States v. Parris</u>, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), a securities fraud case. There, Judge Block, citing Judge Rakoff's decision in <u>United States v. Adelson</u>, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), wrote thoughtfully: "I have sentenced Lennox and Lester Parris today to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life. This case represents another example where the guidelines in a securities-fraud prosecution "have so run amok that they are patently absurd on their face," due to the "kind of 'piling-on' of points for which the guidelines have frequently been criticized."

The defendants in <u>Parris</u> were said to have preyed on minorities by touting a stock and falsely manipulating the market, and also engaged in obstruction of justice. (Judge Block set out facts as quoted below).[1]

---

[1]Although the jury found each defendant guilty of conspiracy to commit securities fraud,... securities fraud, ... conspiracy to commit witness tampering and ... witness tampering, the nature of their crimes -- while clearly deserving of the punishment which I have meted out -- is simply not of the same character and magnitude as the securities-fraud prosecutions of those who have been responsible for

wreaking unimaginable losses on major corporations and, in particular, on their companies' employees and stockholders, many of whom lost their pensions and were financially ruined. Yet the sentences entailed in those cases, such as Enron, WorldCom and Computer Associates, were each less, and in some cases markedly less, than the lowest end of the guidelines range in this case.

Here, the Parris brothers were engaged in a rather typical "pump and dump" scheme in the world of the high-risk penny-stock investor. ... [T]he Government established that, in ...2004, they issued ...press releases falsely representing the business prospects and financial condition of Queench, Inc. ..., a fledgling publicly traded company ...in Jericho, New York. As a result, shares of Queench ... began trading at artificially inflated prices ... The increased demand was also reflected in a dramatic surge in Queench's trading volume ... during the period of the fraud, the volume ... reached into the millions.

"Queench" was also the name [of] the company's product, ...bottled water which they wanted  to pitch to minorities. They were the sole directors and their criminal misdeeds centered around their efforts to establish a market for their new product; by and large, their press releases contained some ... truth[] ..., but ...the jury was entitled to view them as material misrepresentations.

More telling ... was the means by which the Parrises personally capitalized  on these misrepresentations. Between January and March of 2004, Queench issued a total of 28.6 million new, unregistered shares to two Florida stock-promotion companies, ... the corporate resolutions authorizing Queench's transfer agent to execute the issues were signed by both defendants as principals for the company.

In late February, Queench's transfer agent ... began questioning the issues of stock .... The defendants provided a legal opinion supporting the transfers, but [the agent] rejected it as inadequate. The defendants thereupon switched to a different transfer agent.

Judge Block noted how draconian the Guideline sentence would be and commented that "[t]o its credit", the prosecutors "shared my angst, recognizing that `your Honor is in a difficult position where you have an enormous guideline range," and conceding that `many reasonable sentences would fall outside that range.' [citation omitted]. Judge Block noted the "admirable discharge of the higher duty of Government lawyers `to seek justice, and not merely to convict'". The prosecutors "understood that a reasonable sentence `may well be one less, perhaps significantly less, than the guidelines range.'" Indeed, "the Government joined me and defense counsel in a collaborative effort to search for an effective means to avoid what Judge Rakoff has

---

[The promoters] sold the newly issued Queench shares to the ... public for ... approximately $ 4.9 million. ... [T]he companies made wire transfers totaling $ 2.56 million to [a] bank account ...controlled by Lester Parris. The money ultimately made its way to both defendants.

... During the [SEC] investigation, Lennox asked his then-girlfriend ... to sign a back-dated statement that  she had sold 4 million Queench shares to [the promoter] and lent Parris[' company] $ 300,000. Although [the girlfriend] refused, Lester nevertheless submitted the statement to the SEC with her forged signature. Both defendants later told [her] to [say] ...she had authorized them to sign her name.

appropriately described as `the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.' <u>Adelson</u>, 441 F. Supp. 2d at 512."  <u>United States v. Parris</u>, 573 F. Supp. 2d 744, 747-751 (E.D.N.Y. 2008).

Judge Block noted huge sentencing disparities and lesser sentences for far worse conduct.  The chart used by Judge Block is of interest, because it shows that, even where there are huge losses or gains to the defendant, sentences have been lower than the sentence urged by the government for the misdemeanor-like offense in this case.[2]

_____

[2] "The Government and I were in agreement, therefore, that even if there were dissimilarities in the array of national securities-fraud sentences precluding the applicability of § 3553(a)(6) under Wills, they nonetheless bore upon the relative seriousness of the nature of the defendants' crimes under § 3553(a)(1). Thus, although the sentences in the Government's compendium obviously were impacted by many variables, such as whether they were imposed before or after the passage of the Sarbanes-Oxley Act, [footnote omitted] ...or whether the defendant pleaded guilty or was a cooperator, it was perfectly clear that there was a  correlation between the losses in those cases and the periods of incarceration: Those who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $ 100 million were generally sentenced to single-digit terms.

"Thus, on the double-digit side, amongst the non-cooperators,

there are, as representative, the following:

| Name | Amount of Loss | Sentence |
| --- | --- | --- |
| Bennett | $ 100 million | 14 years |
| Ebbers | over $ 100 million | 25 years [footnote 8 omitted] |
| Rigas (John) | over $ 200 million | 15 years |
| Rigas (Timothy) | over$ 200 million | 20 years |
| Skilling | over $ 1 billion | 24 years |
| Forbes | approx. $ 14 billion | 10 years |
| Kumar | $ 2.2 billion | 12 years |
| Ferrarini | $ 25 million | 145 months |

"And on the single-digit, non-cooperator side of the Government's compendium, there are:

| Name | Amount of Loss | Sentence |
| --- | --- | --- |
| Hotte | $ 67 million | 108 months |
| Formisano | $ 9.8 million | 78 months |
| Smirlock | $ 12.6 million | 48 months |
| Adelson | $ 50-$ 100 million | 42 months (intended) |
| Betts | $ 1.3 million | 366 days |
| Chavrat | $ 1.1 million | 6 months |
| Tursi | $ 1.1 million | 41 months |
| Scuteri | $ 2.5 million | 21 months |
| Kearney | $ 1.3 million | 51 months |
| Rutkoske | $ 12 million | 108 months |
| Cushing | $ 24 million | 97 months [Id. at 753]" |

Judge Block noted that, "[t]o be sure, there were undoubtedly a host of factors that entered into these sentences, and there were others that seem on the surface to defy this pattern -- for example, Surgent [n9] -- but I simply could not dismiss, in assessing the nature and seriousness of the Parrises' crimes under § 3553(a)(1), the overall

Moreover, Judge Block's opinion discusses the ever-increasing ranges set for various offense levels since the Guidelines were enacted. What for? Increased punishment does not solve all the evils of society, nor constitutes justice. It smacks of vengefulness. As Judge Block wrote, it is "commendable" when a prosecutor understands that Guideline punishment is often too much.

---

relationship of the amount of losses in those cases to the sentences imposed; fairness in sentencing required that I recognize that, although the Parrises' criminal conduct was reprehensible, they were simply not in the same league as the likes of the Enron, WorldCom and Computer Associates defendants."

In footnote 9, Judge Block noted that although his Appendix A "states that Surgent's gains were approximately $ 6 million, the PSR calculated his guidelines range based on a loss to the investing public of $ 46 million; moreover, Judge Gleeson's sentence was undoubtedly influenced by the fact that Surgent received an upward adjustment for his role in the offense as `a licensed attorney [who] had practiced in the field of securities law.' United States v. Surgent, Case No. 04-CR-364 (S-1) (PSR dated Nov. 16, 2005, P 41)." United States v. Parris, 573 F. Supp. 2d 744, 753-754 (E.D.N.Y. 2008).

Although the facts are not in the opinion, an SEC release states that Surgent was a disbarred recidivist. http://www.sec.gov/litigation/litreleases/2006/lr19817.htm,

Even for an "architect" of a "scheme".

Ironically, Steven Coren was not the "architect" of the "CBT" "scheme." According to the proffers that the government makes use of, Steve Coren, for all the credit he wanted to take, did not "conceive" of the CBT. Rather, as written by the investigator who prepared the Report of a 4/19/06 interview: "COREN stated that in 1993, Gil Somers, owner of ... a non-unionized contract[ing company] approached him to establish a benefit fund similar to those offered by unions in order for contractors performing public works projects to satisfy prevailing wage payment obligations. COREN said that he wanted to establish a benefit bank for non-unionized contractors to contribute their prevailing wage fringe benefit obligations instead of remitting such payments directly to the union." With the help of the owner of a third party administrator (name unknown) and an insurance agent, Mr. Coren set up a benefit trust. Employees would qualify for benefits on a "nondiscriminatory basis" (as required by ERISA). The third-party administrator "arranged for a lawyer in Utah (name unknown) to draft the Employee Retirement Income Security Act (ERISA) Trust entitled,

`Declaration of Trust.' Various contractors then participated in the trust fund. Shortly thereafter, Sneider sold his business and GMR Associates took over as third party administrator. In around 1999-2000, Loub set up a separate trust in competition with COREN and, as a result, COREN utilized the International Benefits Administrators (IBA) as his third party administrator for the trust fund that was now named the `Contractors Benefits Trust'".

Steve Coren told the agents and prosecutors that "he intended to use the CBT as a service for his contractor clients." Unfortunately, when he considered legal implications, he came up with the "circumvention" of prevailing wage laws that brought him to this day. Notably, when the government asked Steve Coren why he did this, he "explained that he operated the CBT with an eye toward benefitting the employer, and not the prevailing wage worker." Those, of course, were his clients.

He went too far. He deserves abuse of trust points, perhaps, but he was never the "grand architect" of a huge scheme that caused the type of damage that justifies a 262-month sentence, nor warrants a 4-

point managerial bump-up when the Guidelines are calculated.  As he told the investigators on 4/20/06, he was a lawyer who "pushed the edge."

That is precisely what the government is doing now.  The government complains that we "don't accept" the Court's rulings upholding the indictment.  We must and do "accept" them for purposes of sentencing – though we clearly do not accept the rulings as final rulings that should not be appealed.   Whether counsel "accepts" the ruling or not, there are distinctions in motivation and  intent that should be brought to the attention of the Court when a sentence is considered.   And if it happens that the defendant were to win on appeal on the ground that the novel interpretation of federal law is just wrong, as occurred recently in another of present counsel's cases (see United States v. Ness, 565 F.3d 73  (2d Cir., argued 2006, reversed on remand from Supreme Court, May 8, 2009) (reversing convictions in a money laundering / § 1956 prosecution where the conduct charged and proved was not a crime, after Mr. Ness (my client) had spent six years in jail), then it will be the government who has "pushed the edge way

too far".

Pushing the edge is not limited to Mr. Ness's case.  In Senator Stevens' prosecution in Alaska, an edge was breached.  So too there is the recent announcement in the Miami Herald, November 25, 2009, that the Justice Department has just dropped a "controversial" money laundering "test case" against Florida Attorney Ben Kuehne, based on his advice to another defense attorney that he could accept $5.2 million in payments for a kingpin drug defendant Ochoa because the money was "clean".  This dismissal came after the Court of Appeals had dismissed one of the government's charges – "the backbone of their case" – because the money laundering statute contains when there was a statutory exception for moneys paid to lawyers.

The Court ought to consider that this is a novel prosecution, because it is relevant when setting a fair sentence.

In this case, as unfortunately in many cases, the prosecutors have taken a far more punitive stance than is deserved.  We have prosecutors who push to the limits by making the meaningless argument, to support a completely disproportionate sentence, that

"Coren's crime is in a class by itself" (Gov. Mem. 63).

The prosecutors argue that it is "in a class by itself" because they want, at any cost, to ignore the fact that the conduct was a misdemeanor in New York at the time of the offense – indeed, that though the State had taped Steve Coren advising Whitley and Torres in 2001, it was apparently not deemed important enough to prosecute until 2006.

They argue that it is "in a class by itself" because Steve Coren is not a contractor who failed to pay his workers the required wages (actually, fringe benefits, because there is no allegation that he ever participated in advocating or advising not paying wages). (Gov. Mem.63).

At bottom, though, regardless of how they package it, Steve Coren's offense was a prevailing wage offense. That he is a lawyer who figured out a clever explanation using ERISA law in an improper way, "is of no moment" (to use the prosecutors' words), because the advice led to a prevailing wage violation, and no more.

Less, Not More, "Punishment" Is Called For Here

The prosecutors have lost perspective. Even in this world of escalating punishment which does no real good, courts have imposed sentences far less severe, for worse crimes, than the sentence urged by the prosecutors here. Or put another way, a sentence of the length pushed by the government here has been, and should be, reserved for the "worst" offenders.

Again, Lynn Stewart, a lawyer who helped her terrorist client spread the word to his followers, now has a 20-month sentence. Probably it will be increased (if the district court takes the "cue" from the Circuit), but look at the differences in the offense. And <u>Cavera</u>, which the government cited for holding the entire contract amount of a Medicare fraud (failing to test pacemakers to specification) was given a probationary sentence (although once again that was remanded.)

In <u>United States v. Thurston</u>, __ F.3d __, No. 05-2271 (1st Cir. 2008) the Court affirmed a sentence of 3-months' incarceration, two years' supervised release, and a fine in a $5-million for Medicare fraud after a jury trial conviction, rejecting a 60-month advisory Guideline sentence).

We wrote in the initial Sentencing Memorandum that probation is a sentence deemed "sufficient" for non-violent first-time offenders. 18 U.S.C. 994(j). While Judge Scheindlin sentenced defendant Bourke in a Foreign Corrupt Practices Act case to a year and a day, and not probation, she cited § 994(j) in her oral ruling rejecting the government's push for a sentence of 10 years and its embrace of a Guideline level of 52 in that case. (She also allowed Bourke to remain free on bail pending appeal. )

Overcriminalization is a topic gaining "traction" with previously unlikely partners. See "Taking on the Criminal Justice System", New York Times, http://www.nytimes.com/2009/11/24/us/24crime.html?_r=1&ref=todaysp aper. As that article mentions, Richard Thornburgh, former Attorney General of the United States, recently testified before the House of Representatives Subcommittee on Crime, Terrorism, and Homeland Security. Thornburgh discussed the fact that various groups, conservative and liberal (the Heritage Foundation, Washington Legal Foundation, the National Association of Criminal Defense Lawyers, the

ABA, the Cato Institute, the Federal Society and the ACLU) all support

revising the criminal code and putting a stop to criminalization of

conduct "that is better dealt with by the seeking of civil and regulatory

remedies." See

http://judiciary.house.gov/hearings/pdf/Thornburgh090722.pdf

The government's push to insert itself into this area of State

concern, and then to "up" the penalty that the State assigned, is part of

the problem. This Court should reject the government's misguided

effort to take over enforcement of State laws and then get federal

courts to impose sentences so lengthy that they have no legitimate

purpose.

The prosecutors offer Your Honor no principled bases to impose

the Guideline sentence they urge – a sentence premised on

enhancements that should not apply, and the piling on of overlapping

enhancements. They urge Your Honor to go its way because you can do

so, and Your Honor's decision is entitled to deference on appeal.

The Court should see the tactic for what it is: The government is

asking this Court to impose a term of excessive imprisonment because

of an appellate court's standard of "deference".

The government is in essence advising the Court to presume the correctness and propriety of the Guideline sentence it calculates. The law is clear now that the Guideline sentence is not to be presumed correct. Further, it is not and should not be a defendant"s burden to "articulating" why the Guideline sentence is not appropriate, as suggested by the government (Gov. Mem. 60-61).

We have set forth numerous factors that justify a probationary sentence – including the departure ground recognized by the Probation Department, that defendant has lost his license to practice law and his business. This is not a trivial concern. It is punishment. And it is punishment enough to deter the legal community from "pushing the edge".

If the Court deems incarceration "necessary", it should order "intermittent confinement", as State Judge James Yates has done as to Marsh McClennan defendants convicted of antitrust offenses, basically regulatory crimes. See

http://www.crainsnewyork.com/article/20091027/FREE/910279998

(discussing recent acquittal of three Marsh executives accused of colluding with AIG to arrange noncompetitive bids) and http://www.bloomberg.com/apps/news?pid=20601203&sid=aH2jEBJzW 0Mo&refer=insurance (discussing imposition of a sentence of 16 weekends in jail as to two defendants found guilty of an antitrust charge, and noting that sentences have been stayed pending appeals. )

Intermittent incarceration is an option under the Probation Statute, 18 U.S.C. §  3563(b)(10) (court may sentence defendant to weekends for the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release).  It is now also embraced in a new Guideline, U.S.S.G. § 5F1.8 (according to the Sentencing Commission's website, http://www.ussc.gov/2009guid/20090501_Reader_Friendly_Amendment s.pdf .)  "Intermittent confinement" usually means spending only nights and weekends in custody, but judges may specify other intervals of time.  This new guideline (and the Judicial Administration and Technical Amendments Act of 2008, which inspired it) show that the Commission and Congress recognize that judges should consider

sentences other than traditional imprisonment.

The Probation Statute offers other alternatives to incarceration that would be "sufficient" here. See 18 U.S.C. 3563(b) (Court may order a defendant to "(12) work in community service as directed by the court." An alternative to incarceration would serve the real interests of the community instead of stripping Steven Coren of any ability to continue earning a livelihood, crushing his productivity, removing a tax-paying member of society for no purpose that has not already been met. Incarceration would be a drain on resources to no good end. Incarceration is a sentence "greater than necessary" from everyone's standpoint.

A Stay Pending Appeal Should Be Granted

I asked the government lawyer to consent to bail and a stay pending appeal. Although the immediate answer was "no", I asked the prosecutor to consider that there are two serious legal issues that ought to be decided by the Court of Appeals before any sentence is begun to be served.

I am heartened to see that the government has not repeated its automatic "no".  But it is holding its consent to see what this Court does.

The government should have no basis to object to bail and a stay, given the issues underlying this case.  The government does have a basis to consent to a stay.

The statute says bail "shall" be granted when there are issues, the ruling on which may obviate a sentence entirely.  There are such issues here.

Bail, and a stay, pending appeal are appropriate.

CONCLUSION

For reasons stated in the initial sentencing submission, for reasons expressed by Steve Coren's many friends and associations who, knowing of this misconduct, nevertheless believe that he deserves a break, for reasons stated in 28 U.S.C. 994(j), which recognizes that probation is appropriate for a non-violent first time offender, this Court should sentence Steve Coren to probation and to a monetary fine.

We ask that the sentence be stayed pending appeal.


November 30, 2009

_____
Vivian Shevitz
Attorney for Defendant
150 Greenway Terrace - 52W
Forest Hills, New York 11375
914-763-2122
Fax: 888-859-0158
Vivian@shevitzlaw.com